654 So.2d 1311 (1995)
CITY OF BATON ROUGE
v.
Shelton ROSS.
No. 94-KA-0695.
Supreme Court of Louisiana.
April 28, 1995.
*1313 Richard P. Ieyoub, Atty. Gen., Carl James Jackson, City Atty., for applicant.
David William Price, Leon Jackson, for respondent.
CALOGERO, Chief Justice.[*]
Shelton Ross was charged by the City of Baton Rouge with violating a municipal ordinance which prohibits "drug traffic loitering." Ross filed a motion to quash alleging that the ordinance was unconstitutional and expressly preempted by legislative enactment. The City Court of Baton Rouge granted defendant's motion to quash, finding the ordinance unconstitutionally vague and overbroad, and invalid under the express legislative preemption provision of LSA-R.S. 14:143.[1]
The City of Baton Rouge appealed the decision, invoking our appellate jurisdiction under Article V, § 5(D) of the Louisiana Constitution of 1974. Based upon our review of the record and our examination of the applicable constitutional, statutory, and municipal law, we affirm the trial court's ruling that the "drug traffic loitering" ordinance is expressly preempted by LSA-R.S. 14:143, and therefore affirm the judgment quashing the affidavit charging a violation of the municipal ordinance. Because we affirm the trial court's ruling on nonconstitutional grounds, the Court finds it unnecessary to address the portions of the trial court's judgment declaring the ordinance unconstitutional.

I. Facts and Procedural Background
On September 29, 1993, two Baton Rouge City Police officers were parked at a corner on Chippewa Street in Baton Rouge. Two men, one of them the defendant, Shelton Ross, were leaning against a fence nearby. Although the two individuals were not engaged in any obvious criminal activity, the officers nonetheless called them over to their *1314 vehicle. One officer then questioned the two individuals while the other searched the ground near where the men had been standing. A piece of paper containing three rocks of cocaine was found near the fence, and the two men were issued misdemeanor summonses.
On October 20, 1993, the City of Baton Rouge filed a misdemeanor affidavit in the Baton Rouge City Court charging Shelton Ross with one count of violating Title 13:1055 of the Baton Rouge Code of Ordinances pertaining to "drug traffic loitering."[2] The ordinance provides in pertinent part as follows:
Section 13:1055. Drug-Traffic Loitering.
(a) As used in this section:
* * * * * *
(5) "Public Place" is an area generally visible to public view and includes, but is not limited to, streets, sidewalks, bridges, alleys, plazas, parks, driveways, parking lots, transit stations, shelters and tunnels, automobiles (whether moving or not), and buildings, including those which serve food or drink, or provide entertainment, and the doorways and entrances to buildings or dwellings and the grounds enclosing them.
(b) A person is guilty of drug-traffic loitering if he or she remains in a public place and intentionally solicits, induces, entices, or procures another to engage in unlawful conduct contrary to L.R.S. 40:966 through 40:971.1.
* * * * * *
(d) A person is not guilty of drug-traffic loitering if he or she merely remains in a public place without also intentionally soliciting, inducing, enticing, or procuring another to engage in unlawful conduct contrary to L.R.S. 40:966 through 40:971.1.
On October 29, 1993, Ross filed a motion to quash the misdemeanor affidavit. He alleged a number of grounds for the invalidity of the ordinance in his motion, the only one of which is pertinent to this opinion being a contention that the ordinance was preempted by LSA-R.S. 14:143, see Note 1, supra, which makes it a municipal misdemeanor to "engage in unlawful conduct contrary to L.R.S. 40:966 through 40:971.1."
The trial court conducted hearings on the motion to quash on January 4, 1994, and January 7, 1994. No witnesses were sworn, both hearings consisting solely of the arguments of counsel upon the motion. The defense argued that the ordinance, insofar as it represented an attempt by a political subdivision of the State of Louisiana to enact an ordinance criminalizing conduct also punishable as a felony under state law, was preempted by LSA-R.S. 14:143.
In response, the city prosecutor first observed that LSA-R.S. 14:143 was enacted in response to past occasions where a criminal defendant had been convicted of violating a municipal ordinance, by definition a misdemeanor, and had then been able to successfully plead double jeopardy when faced with a subsequent State felony prosecution arising out of the same conduct. The city prosecutor then noted that conviction under the ordinance required proof of an element, i.e. that the crime be committed "in the public," not found in any comparable state felony statutes. The city prosecutor concluded from this analysis that in this case double jeopardy would not lie for a subsequent state felony prosecution, and that therefore the ordinance *1315 was not preempted by LSA-R.S. 14:143.
The trial court granted the defendant's motion to quash. In addition to declaring the ordinance unconstitutionally vague and overbroad, the trial court also found the ordinance to be preempted by LSA-R.S. 14:143.[3] The trial court signed a written judgment ordering the prosecution quashed on January 7, 1994.
The City of Baton Rouge timely perfected an appeal to this Court, invoking our jurisdiction under Article V, § 5(D) of the Louisiana Constitution of 1974. Jurisdiction is proper in this case because it involves an ordinance passed by a duly constituted municipality of this state which has been declared unconstitutional. See Note 2, supra; Holthus v. Louisiana Racing Comm'n, 569 So.2d 547 (La.1990). In addition, our jurisdiction extends to all issues of law presented by the trial court's judgment. La. Const. Art. V, § 5(A), (C), (E). Compare La. Const. Art. V, § 5(F); Church Point Wholesale Beverage v. Tarver, 614 So.2d 697, 700 (La.1993).
For the reasons given below, we affirm the trial court's decision that the ordinance is invalid on nonconstitutional grounds, i.e. that it is expressly preempted by LSA-R.S. 14:143, and therefore affirm the trial court's judgment quashing the misdemeanor affidavit. Our finding on the nonconstitutional issue makes a review of the trial court's declaration of the ordinance's unconstitutionality, the original basis of this Court's jurisdiction in this matter, superfluous, and accordingly we find it unnecessary to reach the constitutional issues ruled upon below. For this reason, we move directly to a discussion of the effect of the statutory preemption provision of LSA-R.S. 14:143 upon the ordinance under which Shelton Ross is being prosecuted.

II. Is Title 13:1055 of the Baton Rouge Code of Ordinances Expressly Preempted by LSA-R.S. 14:143?
LSA-R.S. 14:143 provides that "[n]o governing authority of a political subdivision shall enact an ordinance defining as an offense conduct that is defined and punishable as a felony under state law." The trial court found that Title 13:1055 of the Baton Rouge Code of Ordinances fell within this statutory preemption. The trial court's ruling was based first upon a construction of the statute as a safeguard against duplication of prosecution under state and local criminal provisions, and second upon the conclusion that the City's ordinance penalized a significant amount of "conduct" already regulated by state felony statutes.
Before we consider the application of this statute to this particular ordinance, however, it is necessary that we first construe LSA-R.S. 14:143 to determine its parameters, as neither this Court nor any court of appeal has had the opportunity to interpret LSA-R.S. 14:143 since its passage in 1983. Because the origins of this particular statute shed much light on its purpose and intended scope, we begin with a brief outline of the developments that led to the passage of LSA-R.S. 14:143.

A. History of LSA-R.S. 14:143
The problem this statute is designed to address arises as a consequence of the United States Supreme Court's holding in Waller v. Florida, 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970). In Waller, the Court held that for double jeopardy purposes, a municipality and a state constitute the same sovereign, and therefore a conviction or acquittal entered as a result of the violation of a municipal ordinance bars a later prosecution by a state's attorney under a state statute proscribing the "same offense." The difficulties that Waller created for those state jurisdictions, like Louisiana, which allow different *1316 tiers of government to define and prosecute criminal violations was well-stated by the California Supreme Court in Kellett v. Superior Court of Sacramento County, 63 Cal.2d 822, 48 Cal.Rptr. 366, 409 P.2d 206, 209 (1966) (In Bank):
We recognize that in many places felonies and misdemeanors are usually prosecuted by different public law offices and that there is a risk that those in charge of misdemeanor prosecutions may proceed without adequately assessing the seriousness of a defendant's conduct or considering whether a felony prosecution should be undertaken. When the responsibility for the prosecution for the higher offense lies with a different public law office there is also the risk that a well advised defendant may plead guilty to a misdemeanor to foreclose a subsequent felony prosecution the misdemeanor prosecutor may be unaware of or may choose to ignore. Cases may also arise in which the district attorney is reasonably unaware of the felonies when the misdemeanors are prosecuted. In such situations ... a defendant guilty of a felony may escape proper punishment.
Compare Illinois v. Vitale, 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980); People v. Stefan, 146 Ill.2d 324, 166 Ill.Dec. 910, 586 N.E.2d 1239 (1992); People v. Morgan, 785 P.2d 1294 (Col.1990) (En Banc); State v. Weide, 775 S.W.2d 255 (Mo.App.1989).
This Court first confronted in State v. Suire, 319 So.2d 347 (La.1975), the dilemma presented by a subsequent state prosecution of an offense for which a municipality had already obtained a conviction. In Suire, the defendant was convicted in the Mayor's Court of Lake Arthur for the municipal offenses of disturbing the peace and aggravated battery. When the local district attorney later prosecuted Suire under the state aggravated battery statute, LSA-R.S. 14:34, Suire filed a motion to quash the prosecution on double jeopardy grounds. The district court granted the motion and quashed the prosecution, and the State appealed.
The basis of the State's appeal was that the mayor's court lacked subject matter jurisdiction because Lake Arthur's ordinance penalizing aggravated battery, a state felony offense, was "inconsistent with ... state law" and therefore preempted. Suire, supra, 319 So.2d at 349. See also LSA-C.Cr.P. Art. 595(1).[4] A unanimous Court rejected the State's argument, finding that the ordinance was a legitimate exercise of the Parish's delegated police power and that it was not inconsistent with or in conflict with any state statutes. Id, at 350. The Court specifically noted that, given the absence of any contrary legislative expression, "it is immaterial that the same conduct is punished by both state and municipality in the concurrent exercise of police power." Id.
Justice Tate, the author of the Court's opinion, also authored a special concurrence. In his concurrence Justice Tate stressed that the Court had declined to decide whether *1317 Article VI, § 9(A)(1) of the Louisiana Constitution of 1974[5] was intended "to exempt from local regulation any conduct which the state legislation punishes as a felony." Suire, supra, 319 So.2d at 351 (Tate, J., concurring). In addition, Justice Tate speculated that the legislature might soon enact "clarifying legislation," and that if such legislation were to statutorily "deny local governments the power to enact police regulations punishing conduct which the state punishes as a felony" there would be no need to reach the underlying constitutional question. Id. Justice Tate concluded by reiterating the "need for legislative attention to the problem of concurrent state and local police regulation under the 1974 Constitution." Id.
Despite Justice Tate's entreaties, no legislative action was immediately forthcoming, and six years later this Court revisited the issue in State v. Foy, 401 So.2d 948 (La.1981). In Foy, the defendants pleaded guilty in the Mayor's Court of Tallulah to the violation of a city ordinance defining the crime of burglary and specifying it as a misdemeanor. Foy, supra, 401 So.2d at 949. The local district attorney later prosecuted the defendants in district court under the State felony burglary statute, LSA-R.S. 14:62. Id. The district court quashed the State prosecution on double jeopardy grounds, and the State appealed. Id.
As in Suire, the basis of the State's appeal was that the mayor's court had lacked subject matter jurisdiction over the offense, and that therefore jeopardy had never attached in the initial prosecution. Foy, 401 So.2d at 949. See Note 4, supra. The Court in Foy began by noting that LSA-R.S. 33:441 granted the mayor's court jurisdiction "over all violations of municipal ordinances." Id. The Court then found that under Suire the State had no standing to challenge any constitutional infirmity in the statute establishing the jurisdiction of the mayor's court, and therefore affirmed the district court's judgment.[6]Id., at 950.
Justice Dennis, although concurring in the majority's decision in the case, wrote separately to address the State's argument that Article VI, § 9(A)(1) of the Louisiana Constitution of 1974, see Note 5, supra, in and of itself preempted the city court's subject matter jurisdiction.[7] After pursuing "an extensive examination of the transcripts of the constitutional convention debates" dealing with Article VI, § 9(A)(1), Justice Dennis concluded that "the constitutional intent was merely to limit the power of municipalities to the imposition of punishment without hard labor for a violation of a municipal regulation" and not to also limit what conduct those regulations might address. Foy, supra, 401 So.2d at 951 (on rehearing) (Dennis, J., concurring). However, Justice Dennis, hearkening back to the sentiments expressed in Justice Tate's special concurrence in Suire, also remarked that "the abuses referred to in the state's application for rehearing and oral argument on rehearing indicate a possible need for legislative attention to the problem of concurrent state and local jurisdiction of criminal prosecutions based on felonious conduct." Id., at 951.
In 1983, the legislature responded to the suggestions of Justice Tate in Suire and Justice Dennis in Foy with LSA-R.S. 14:143. 1983 La.Acts, No. 531, § 1. The minutes of the House committee which considered it reveal that the statute is "designed to alleviate a person pleading guilty to a municipal offense of something like burglary and then it is impossible for the district attorney to *1318 prosecute as a state offense (which is a felony)." Committee Meeting Minutes, House Comm. on Admin. of Criminal Justice, House Bill No. 275, Pp. 4-5 (April 21, 1983). The factual scenario discussed in committee was identical to that in Foy, indicating a legislative awareness of this Court's decision in Foy and a legislative desire to resolve the concurrent jurisdiction problem in the favor of the State.[8]
In construing LSA-R.S. 14:143, therefore, we must examine the terminology employed in the statute in light of its purpose as revealed by this history. That purpose is to prevent local governments from passing criminal ordinances defining as a misdemeanor the "same offense" (as that term is understood in the double jeopardy context) proscribed by a State felony statute.

B. The Constitutional Underpinning of LSA-R.S. 14:143
Before we continue, however, we consider it advisable to first discuss whether the statute rests upon firm constitutional grounds, particularly since issue of whether the statute impermissibly robs local governments of powers delegated to them by the Louisiana Constitution of 1974 was raised below by the city prosecutor in response to the defendant's preemption argument.
As the foregoing discussion reveals, the statute aims to deprive local governments of a degree of their lawmaking authority. Such a result invites our scrutiny, particularly when Home Rule Charter governments like the City-Parish government of Baton Rouge are affected. "Home rule entities must be regarded as more than creatures of the legislature, since their powers and functions are granted directly by the constitution and their discretion is constitutionally preserved against undue interference." Francis v. Morial, 455 So.2d 1168, 1173 (La.1984) (citation omitted).
We have no difficulty in deciding that LSA-R.S. 14:143 is constitutional insofar as it is directed at those local governments that function under a Home Rule Charter adopted after the effective date of the Louisiana Constitution of 1974. Article VI, § 5(E) of our constitution provides that such a home rule charter government may only exercise "any power ... not denied by general law." The same limitation applies to governmental subdivisions not under the authority of a Home Rule Charter. La. Const. Art. VI, § 7(A). LSA-R.S. 14:143, as a "law of statewide concern enacted by the legislature which is uniformly applicable ... to all political subdivisions," is just such a "general law," and therefore may constitutionally circumscribe the authority of such local governments. La. Const. Art. VI, § 44(5). Compare Lafourche Parish Council v. Autin, 94-CA-0985, 648 So.2d 343 (La.1994).
However, in this particular case we are dealing with a Home Rule Charter Government that pre-existed the 1974 Constitution. See Note 2, supra. For such an entity different rules apply, as we recently stated in City of New Orleans v. Board of Com'rs, No. 93-C-0690, 640 So.2d 237 (La.1994). In City of New Orleans, we concluded that Article VI, § 4 of the Louisiana Constitution of 1974 provided not only that those Home Rule Charter governments existing prior to our 1974 constitution retained the power they had exercised under the 1921 constitution, but also that they retained this power absent the limitation that legislative supremacy had previously presented. We thus made it clear that when confronting such home rule entities the legislature no longer possesses, as it did under the 1921 Constitution, "the unqualified power to withdraw, preempt, or overrule a local law that is consistent with the constitution and was enacted pursuant to a constitutionally maintained preexisting home rule charter." City of New Orleans, supra, 640 So.2d at 251. Contrast City of New *1319 Orleans v. Board of Supervisors, 43 So.2d 237, 242 (La.1949).
However, we also recognized that Article VI, § 9(B), which provides that "the police power of the state shall never be abridged," demands that the ascendancy of pre-1974 Home Rule Charter governments not be absolute. See also Hildebrand v. City of New Orleans, 549 So.2d 1218, 1225 (La. 1989), cert. denied, 494 U.S. 1028, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1989) ("[Art. VI, § 9] does not purport to strip the subdivision entirely of its police power, but simply sets forth specific limitations in certain areas"). We then articulated the test by which the balance between these two competing constitutional interests should be resolved: "a litigant claiming that a home rule municipality's local law abridges the police power of the state must show that the local law conflicts with an act of the state legislature that is necessary to protect the vital interest of the state as a whole." City of New Orleans, supra, 640 So.2d at 252 (citations omitted).[9] We apply that test to the constitutional validity of LSA-R.S. 14:143, examining the statute to see if it "is necessary to protect the vital interest of the state as a whole."
The statute, as has already been discussed, is designed to prevent municipal interference in State felony prosecutions. The responsibility to protect citizens from criminal depredation is one of the most fundamental aspects of the State's police power.[10] One way in which the State, through its legislature, acts upon that responsibility is by assessing the harm that certain conduct causes, proscribing that conduct, and imposing punishment for engaging in that conduct. The most severe of these crimes are those "for which an offender may be sentenced to death or imprisonment at hard labor," i.e. felonies. LSA-R.S. 14:2(4).
In this case the State's interest is one of constitutional import, since the Louisiana Constitution of 1974 expressly accords to the legislature, and not to local governments, the exclusive right to define felonies and to the district attorneys the exclusive right to prosecute them. See La. Const. Art. VI, § 9(A)(1); Art. V, § 26(B). More particularly, the Louisiana Constitution expressly provides that "[n]o local governmental subdivision shall ... define and provide for the punishment of a felony." La. Const. Art. VI, § 9(A)(1). When a municipality defines as a misdemeanor an offense that the legislature has designated a felony, and places a defendant in "jeopardy" for committing that offense so that the State cannot later retry the defendant, the municipality effectively prevents the State from inflicting upon the defendant the punishment the Legislature has decided is appropriate for the severity of that defendant's conduct.[11] While such a *1320 substitution of judgment may be quite proper in matters of local concern, criminal justice is a field which is perhaps uniquely a matter of statewide, and not local, concern. Accord, Township of Chester v. Panicucci, 62 N.J. 94, 299 A.2d 385, 390 (1973); People v. Stone, 190 Cal.App.3d Supp. 1, 236 Cal.Rptr. 140, 146 (1987). This is particularly true in Louisiana, where the legislature has traditionally enjoyed plenary power over "the determination and definition of acts which are punishable as crimes." State v. Taylor, 479 So.2d 339, 341 (La.1985). See also La. Const. Art. III, § 1(A); State v. Rodriguez, 379 So.2d 1084, 1085 (La.1980). For these reasons, we can only conclude that when the legislature took the advice of two respected justices of this court and enacted LSA-R.S. 14:143, it did so in pursuit of a "vital interest of the state as a whole."
We also find that the statute is "necessary" to further that interest. In City of New Orleans, we stated that "to demonstrate that the state statute is `necessary' it must be shown that the protection of such state interest cannot be achieved through alternate means significantly less detrimental to home rule powers and rights." City of New Orleans, supra, 640 So.2d at 252. In this case the state interest is imperilled because of the existence of a municipal ordinance which defines the "same offense," as that term is understood in the double jeopardy context, as an existing state felony statute. There simply is no alternative to preempting such an ordinance if the vital state interest in ending local governmental "interference" in state felony prosecutions is to be advanced.
Thus, we find that the statute is a constitutional exercise of the legislature's police power. We are obligated not to forget, however, the constitutional backdrop against which we proceed with our construction of the LSA-R.S. 14:143. Although on its face we find LSA-R.S. 14:143 to be a constitutional exercise of legislative authority, it remains so only if narrowly construed, since an expansive reading of the preemptive scope of the statute might "impermissibly infringe upon the local affairs of a home rule government." Bayou Cane Fire Dept. v. Terrebonne Parish, 548 So.2d 915, 920 (La.1989). With this limitation in mind, we advance to the construction of LSA-R.S. 14:143.

C. Construction of LSA-R.S. 14:143
In drafting LSA-R.S. 14:143, the legislature was aware of the constitutional implications of preempting a significant part of Louisiana local governments' criminal jurisdiction. Thus, to specify the scope of the statute's effect, the legislature utilized a number of terms which are defined in the constitutional article dealing with local governments. See La. Const. Art. VI, § 44. We now turn to those definitions to assist us in our construction of the statute.
A "[g]overning authority" is "the body which exercises the legislative functions of the political subdivision." La. Const. Art. VI, § 44. A "[p]olitical subdivision" is "a parish, municipality and any other unit of local government... authorized by law to perform governmental functions." Thus, LSA-R.S. 14:143 by its express terms is aimed at the legislative branch of local government.[12] *1321 Compare LSA-R.S. 40:1796 ("[n]o governing authority of a political subdivision shall enact... any ordinance or regulation more restrictive than state law concerning ... firearms or ammunition").
From the legislature's choice of these terms, viewed in light of the statute's purpose, we conclude that the legislature intended that the preemption of a local ordinance under this statute be accomplished through a facial challenge of the ordinance as written, and not from one or more case-by-case adjudications based upon particular facts. A corollary to this conclusion is that any ordinance which falls within the preemptive scope of the statute cannot be given a "saving" construction; rather, if the ordinance, according to its plain language, presents a substantial risk that a prosecution under it will place a defendant in "jeopardy" so as to bar a subsequent state felony prosecution, that ordinance must fall. We reach this determination because of the need for uniformity in this area (a need which substantiates the State's interest), as well as the practical difficulties of having trial judges prophesy upon an empty record the evidence and argument to be proffered in any given proceeding.
Having determined that the preemption under LSA-R.S. 14:143 is limited to a facial comparison of the municipal ordinance and comparable state felony statutes, we must next consider what municipal ordinances fall within its scope. It is clear from the foregoing discussion that the statute is meant to preempt any penal ordinance which is sufficiently similar to a state felony statute as to constitute the "same offense" for double jeopardy purposes. Therefore, we look to double jeopardy jurisprudence to discover a standard by which we may determine whether an ordinance is preempted under the statute.
Under LSA-C.Cr.P. Art. 596,
Double jeopardy exists in a second trial only when the charge in that trial is:
(1) Identical with or a different grade of the same offense for which the defendant was in jeopardy in the first trial, whether or not a responsive verdict could have been rendered in the first trial as to the charge in the second trial; or
(2) Based on a part of a continuous offense for which offense the defendant was in jeopardy in the first trial.[13] *1322 See U.S. Const. amend. V ("nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb"); La. Const. Art. I, § 15 ("[n]o person shall be twice placed in jeopardy for the same offense").[14] In determining whether two prescribed offenses constitute the "same offense" for double jeopardy purposes, Louisiana courts have applied two different standards, the "same evidence" test and the Blockburger or "same elements" test. State v. Fontenot, 408 So.2d 919, 921 (La.1981).
The "same evidence" test focuses upon the actual physical and testimonial evidence necessary to secure a conviction.[15] Under the "same evidence" test, "[i]f the evidence required to support a finding of guilt of one crime would also have supported conviction of the other, the two are the same offense under a plea of double jeopardy, and a defendant can be placed in jeopardy of only one." State v. Steele, 387 So.2d 1175, 1177 (La.1980). "The `same evidence' test depends upon the proof required to convict, not the evidence actually introduced at trial." State v. Knowles, 392 So.2d 651, 654 (La. 1980) (citations omitted). See also State v. Jones, 642 So.2d 252, 254 (La.App. 4 Cir. 1994): State v. Roblow, 623 So.2d 51, 56 (La.App. 1 Cir.1993). Thus, under the "same evidence" test our concern is with the "evidential focus" of the facts adduced at trial in light of the verdict rendered, i.e. how the evidence presented goes to satisfy the prosecution's burden of proof.[16]State v. Miller, 571 So.2d 603, 606 (1990); State v. Powell, 598 So.2d 454, 470 (La.App. 2 Cir.1992), writ denied, 605 So.2d 1089 (La.1992).
*1323 Although the primary test employed by Louisiana courts to determine whether double jeopardy lies for any given prosecution, the "same evidence" test provides no workable standard for the preemption of ordinances under LSA-R.S. 14:143. This is because, by its very nature, the "same evidence" test requires that at least one trial be completed so that a trial judge may compare the evidence offered to convict the defendant at the first trial with that which the prosecution intends to offer at the second trial.[17] Since double jeopardy under the "same evidence" test revolves around how particular facts are utilized at trial, this test does not lend itself to the sort of facial statutory comparison which we find LSA-R.S. 14:143 mandates.
A different result obtains when the Blockburger or "same elements" test, employed by the United States Supreme Court to determine when two offenses are the "same" for double jeopardy purposes, is considered. United States v. Dixon, ___ U.S. ___, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). See also Peter J. Henning, Precedents in Vacuum: The Supreme Court Continues to Tinker with Double Jeopardy, 31 Am.Crim. L.Rev. 1 (1993). The Blockburger test, first articulated in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), requires a comparison of the elements of the statutes under which a defendant is charged. After the statutory elements are compared, "if each statute requires proof of an additional fact which the other does not" then those statutes do not define the "same offense" for double jeopardy purposes. People v. Mendoza, 190 Colo. 519, 549 P.2d 766, 769 (1976) (En Banc) (citations omitted).[18]
*1324 Application of the Blockburger test serves the purpose of LSA-R.S. 14:143 well, in that it provides a straightforward method of determining whether, on its face, a municipal ordinance constitutes the "same offense" as a state felony statute. We thus hold that a trial court, when faced with a challenge to a municipal ordinance on the ground that it is preempted by LSA-R.S. 14:143, should apply the Blockburger test.[19] If the trial court finds that the elements of that municipal ordinance establish the "same offense" as any felony offense established by the legislature, i.e. that the municipal ordinance and the comparable state statute do not each require proof of a fact that the other does not, then that municipal ordinance is preempted and must be declared void. See Note 18, supra. In addition, the entire range of lesser-included offenses contemplated by the municipal ordinance or the state statute should be considered in this analysis; if any hypothetical combination suffices to constitute the "same offense" under Blockburger, the entire ordinance must fall. Id.

D. Is Title 13:1055 of the Baton Rouge Code of Ordinances preempted by LSA-R.S. 14:143?
We now turn this formula to the ordinance before us.[20] The ordinance is violated if "[a] person ... remains in a public place and intentionally solicits, induces, entices, or procures another to engage in unlawful conduct contrary to L.R.S. 40:966 through 40:971.1." The trial court found that the ordinance was invalid because part of proving a violation of the ordinance was a showing that LSA-R.S. 40:966-971.1 had been violated as well.
Insofar as the trial court found sections 40:966 through 971.1 of R.S. 40 to be lesser-included offenses of the ordinance, the trial court failed to appreciate the nature of the offense established by the ordinance as one of criminal solicitation. "It is clear that solicitation and the other inchoate offenses are not lesser included offenses of the principal crimes." People v. Landwer, 254 Ill.App.3d 120, 193 Ill.Dec. 273, 282, 626 N.E.2d 306, 315 (1993), appeal allowed, 155 Ill.2d 570, 198 Ill.Dec. 548, 633 N.E.2d 10 (1994). Accord, State v. Beavers, 394 So.2d 1218, 1224 (La. 1981) ("inciting to riot" and "participating in a riot" are separate offenses); State v. Eames, 365 So.2d 1361 (La.1978) (Id). Thus, double jeopardy would not lie under Blockburger for consecutive prosecutions under the ordinance and for the direct commission of any of the felony offenses found in LSA-R.S. 40:966-971.1, and therefore this contention is not sufficient to invoke the preemptive application of LSA-R.S. 14:143.
Nevertheless, we find that the ordinance is preempted by LSA-R.S. 14:143 because its criminal solicitation provision overlaps with LSA-R.S. 14:28, which makes it a felony offense to "incite a felony." The Baton Rouge ordinance makes it a misdemeanor offense to solicit or procure another for the purpose of violating LSA-R.S. 40:966-971.1, the majority of these sections being felonies; LSA-R.S. 14:28(A) makes it a felony offense to "incite or procure another person to commit a felony." Insofar as a number of the offenses defined at LSA-R.S. 40:966-971.1 are felonies, the municipal ordinance and LSA-R.S. 14:28 define the "same offense" under Blockburger.
The fact that the ordinance contains as an element of the offense that the proscribed conduct take place "in public" does not vary our decision, since both the ordinance and *1325 LSA-R.S. 14:28 must require proof of a fact the other does not for them to be separate offenses under the Blockburger or "same elements" test. See Note 18, supra. There is simply no fact that must be demonstrated to show a violation of LSA-R.S. 14:28 that would not also satisfy in part the city prosecutor's burden in proving a violation of the Baton Rouge ordinance.[21] Therefore, we find that Title 13:1055 of the Baton Rouge Code of Ordinances is preempted by LSA-R.S. 14:143.[22]

E. The State's recourse under LSA-R.S. 14:143
It must be recognized that this particular case is in some ways a deviation from the scenario envisioned by the legislature when it passed LSA-R.S. 14:143. That statute was passed to prevent criminal defendants from availing themselves of a municipal prosecution and its attendant lesser punishments and thereupon avoiding a later felony prosecution by the State for the same conduct. Thus, this situation, a criminal defendant utilizing LSA-R.S. 14:143 and the existence of a comparable state felony statute to avoid a municipal prosecution, must be considered somewhat anomalous.
Furthermore, a state prosecutor may not be able to intervene or institute a parallel felony prosecution in state district court once a municipal prosecution has begun in a municipal court. Although municipal and district courts enjoy concurrent jurisdiction, "it is a well-established rule of law that, where two courts have concurrent jurisdiction over the same subject matter, the court which first obtains jurisdiction obtains it to the end of the controversy to the exclusion of all others." State v. Sawyer, 57 So.2d 899, 902 (La.1952). Thus, once a prosecution has commenced in a municipal court, the district attorney is precluded from intervening and obtaining the dismissal of such prosecution on the grounds of preemption, since "[n]o district attorney ... shall appear, plead, or in any way defend or assist in defending any criminal prosecution or charge." La. Const. Art. V, § 26(C). See also LSA-C.Cr.P. Art. 65. Finally, the State of Louisiana may have no standing to raise any sort of postconviction challenge to a conviction under a municipal ordinance because it was not party to the original prosecution. See Foy, supra, 401 So.2d at 950, citing Suire, supra.[23]
*1326 By passing LSA-R.S. 14:143, the Legislature has endeavored to confer upon the state as prosecutor a means of protecting its prerogative to pursue felony prosecutions free from unnecessary obstacles. Compare Board of Comm'rs v. Connick, 94-CA-3161, 654 So.2d 1073 (La.1995).[24] Accordingly, we determine that this necessary State interest may be vindicated by recourse to a declaratory judgment action invoking the remedial, i.e. preemptive, provision of LSA-R.S. 14:143.[25]See LSA-C.C.P. Art. 1871 et seq. Compare Cannon v. University of Chicago, 441 U.S. 677, 699, 99 S.Ct. 1946, 1958, 60 L.Ed.2d 560 (1979). The threat of immediate injury that a municipal ordinance proscribing the "same offense" as a felony statute portends for the state and its prosecutor, given that once a prosecution commences under the municipal ordinance the district attorney is unable to intervene, renders such a situation a "justiciable controversy." Church Point Wholesale Beverage v. Tarver, 614 So.2d 697, 701 (La.1993); American Waste v. St. Martin Parish, 627 So.2d 158, 162 (La.1993).

III. Conclusion
We affirm the trial court's ruling that Title 13:1055 of the Baton Rouge Code of Ordinances is expressly preempted by LSA-R.S. 14:143. That statute mandates that if a challenged municipal ordinance establishes the "same offense," as defined by the "same elements" or Blockburger test, as any state felony statute, then that ordinance is preempted. After applying that test to this ordinance, we find the ordinance to be preempted under LSA-R.S. 14:143 because it possesses the "same elements" as LSA-R.S. 14:28 ("inciting a felony"), a state felony offense.

DECREE
For this reason, we affirm the trial court's judgment quashing the prosecution against Shelton Ross.
DISTRICT COURT'S JUDGMENT THAT ORDINANCE IS PREEMPTED BY LSA-R.S. 14:143 AFFIRMED.
CALOGERO, Chief Justice, concurring.
The writer feels it is appropriate to deal with an issue this Court did not reach in the majority opinion. Specifically, I am of the opinion that it is this Court's constitutional duty to address the trial court's declaration that Title 13:1055 of the Baton Rouge Code of Ordinances is unconstitutionally vague and overbroad. Since, however, a majority of this Court disagrees with this view, I concur specially to discuss those issues which are, after all, the basis of this Court's jurisdiction over this case.

I. Why the Trial Court's Ruling Declaring the Ordinance Unconstitutional Should be Addressed
This Court entertains this case in the exercise of its appellate jurisdiction, invoked by the City of Baton Rouge pursuant to Article V, § 5(D)(1) of Louisiana's 1974 Constitution since it involves review of a trial court's determination that a municipal ordinance is *1327 unconstitutional.[1] "The distinction between supervisory and appellate jurisdiction is a continuation of existing terminology, `supervisory' referring to the court's discretionary jurisdiction under which it has the power to select the cases it will hear, and `appellate' contemplating cases in which a party as a matter of right can demand that the court hear a case." Lee Hargrave, The Judiciary Article of the Louisiana Constitution of 1974, 37 La.L.Rev. 765, 795 (1977) (emphasis added). As then-Chairman (now Justice) Dennis put it during the constitutional convention,
"Subparagraph (D) [of Article V] provides for cases which are appealable of right to the Supreme Court. The Supreme Court by virtue of its supervisory jurisdiction can hear any case that it chooses that arises in the Louisiana court system, however, Subparagraph (D) says that it must hear these kind of cases. It must grant the appeal and hear the case described in Subparagraph (D)...."
State of Louisiana Constitutional Convention of 1973 Verbatim Transcripts, August 15, 1973 at 51.
The traditional rule in Louisiana was that when a case fell within the Supreme Court's appellate jurisdiction, this Court was entitled to review only those issues which had invoked its appellate jurisdiction and no others. See State v. Verret, 87 So.2d 297 (La.1956); City of New Orleans v. Levy, 223 La. 14, 64 So.2d 798 (1953); State v. Bonner, 193 La. 400, 190 So. 625 (1939); City of New Orleans v. New Orleans Butchers' Co-op. Abattoir, 153 La. 536, 96 So. 113 (1923); Town of Ruston v. Fountain, 118 La. 53, 42 So. 644 (1906); State v. Marshall, 24 So. 186 (La. 1898); State v. Zurich, 21 So. 977 (La.1896); Municipality No. 3 v. Blanc, 1 La.Ann. 385 (La.1846). The Supreme Court's jurisdiction in such matters was exclusive, with review of any other issues presented by the case being conducted in the proper circuit or appellate tribunal after the Supreme Court had completed its appellate review. Id.
This approach continued to be the rule until the Louisiana Constitution of 1921 was amended by La.Acts.1958, No. 561. That amendment added the following language to the final paragraph of Article VII, § 10 of the 1921 Constitution, the section addressing the Supreme Court's appellate and supervisory jurisdiction:
If a case is appealed properly to the Supreme Court on any issue, the Supreme Court has appellate jurisdiction over all other issues involved in the case.
The meaning of this amendment to the 1921 Constitution was explained by this Court in Tucker v. New Orleans Laundries, Inc., 241 La. 11, 127 So.2d 182, 183 (1961):
The purpose of this provision is to prevent a division of appellate jurisdiction in any one appeal between this court and a court of appeal. What the provision means is that if an appeal is properly made to this court because the case falls within one of the categories stipulated in Article 7, Section 10, the whole appeal is before this court, and not just the issue which gives us appellate jurisdiction.
Accord, Broussard v. National Food Stores of La., Inc., 258 La. 493, 246 So.2d 838 (1971) (collecting cases).
Louisiana's 1974 Constitution generally continued this rule in Article V, § 5(F), which provides as follows:
(F) Appellate Jurisdiction; Civil Cases; Extent. Subject to the provisions *1328 in Paragraph (C),[2] the supreme court has appellate jurisdiction over all issues involved in a civil action properly before it.

See also Hargrave, supra, at 803. Under the current constitutional scheme, therefore, this Court may exercise appellate jurisdiction over all issues[3] in a civil action "properly before it," which includes, as this Court has recognized, cases in which a supervisory writ has been granted. See Board of Comm'nrs of the Orleans Levee District v. Connick, 94-3161, p. 2 (La.1995); 654 So.2d 1073, 1074, citing Daily Advertiser v. Trans-La, 612 So.2d 7, 15 n. 14 (La.1993) (citations omitted).
However, this provision expressly applies only to "civil actions," i.e. to "[e]very action other than a criminal action." Black's Law Dictionary, P. 312 (Rev. 4th ed., 1968) (citations omitted). The language of Article V, § 5(F) must be read in contrast to its predecessor in the 1921 Constitution, the last paragraph of Article VII, § 10, which applied to cases "appealed properly to the Supreme Court on any issue." Applying the interpretative maxim of expressio unius est exclusio alterius,[4] I conclude that the practice of extending appellate jurisdiction to all issues in a criminal case properly before this Court is not sanctioned by the 1974 Constitution. Indeed, any argument that the broad rule of the 1921 Constitution, encompassing both criminal and civil actions, is retained in the face of the more specific language of Article V, § 5(F) of the 1974 Constitution would render the latter superfluous.
It is not my view, however, that this Court is entirely without authority to address the nonconstitutional issues encompassed by the trial court's ruling. Rather, the 1974 Constitution grants this Court plenary power of discretionary review in the exercise of its supervisory jurisdiction. La. Const. Art. 5, § 5(A). The fact that this case has come to us under the rubric of an appeal does not prevent this Court from treating the City of Baton Rouge's pleadings regarding the nonconstitutional issues as an application for supervisory writs, granting the same and resolving those issues. Compare State v. Peacock, 461 So.2d 1040 (La.1984); State v. Alfred, 337 So.2d 1049 (La.1976). The distinction, however, is that in the absence of a corollary provision to Article V, § 5(F) in the criminal arena, any jurisdiction this Court exercises over the nonconstitutional issues in this case is discretionary supervisory jurisdiction and not "mandatory appellate jurisdiction." Hargrave, supra, at 799.
In the exercise of its discretion, this Court has traditionally shown some reluctance in exercising its supervisory jurisdiction until all mechanisms of judicial review available in lower courts are exhausted.[5]See State v. Wimberly, 414 So.2d 666, 670 (La.1982) (on rehearing), quoting State ex rel. City of New Orleans v. The Judge of the Sixth District Court, 32 La.Ann. 549 (La.1880). See also Albert Tate, Supervisory Powers of the Louisiana Courts of Appeal, 38 Tul.L.Rev. 429 (1964); Comment, Supervisory Powers of the Supreme Court of Louisiana over Inferior Courts, 34 Tul.L.Rev. 165 (1959). While admittedly the nonconstitutional issues presented by this case are res nova, not yet having been passed upon by any appellate court of this state, nonetheless the question of the preemptive reach of LSA-R.S. 14:143 is of such importance to the functioning of the *1329 criminal justice process statewide that I agree that it is prudent for this Court to entertain the issue at this time.
This does not mean, however, that this Court is free to pretermit consideration of the trial court's declaration that the municipal ordinance is unconstitutional. I believe that this Court must attempt to give some meaning to the language of our 1974 Constitution, and that the aforementioned discussion of the pertinent constitutional provisions reveals a design wherein, in criminal matters, "mandatory appellate jurisdiction" must be exercised in priority to "discretionary supervisory jurisdiction." Since I am of the view that it is unwise to consider the distinctions drawn in the language of our Constitution meaningless, I feel that it is appropriate to reach the constitutional issues presented by this case, and proceed now to do so.

II. The Constitutional Issues in the Trial Court
Shelton Ross's motion to quash, aside from alleging the nonconstitutional issues discussed in the opinion of the Court, also alleged that the ordinance was "unconstitutional for being overly broad, and vague under the Federal and State Constitutions." In the hearings on the motion the defense argued that the language of the ordinance, in particular the phrase "remains in a public place," is unconstitutionally vague because it fails to give adequate notice of exactly what conduct is prohibited. In addition, the defense also contended that the ordinance is unconstitutionally overbroad since it unjustifiably criminalizes a number of "constitutionally protected" activities.
In response to the defense's constitutional arguments, the city prosecutor rejoined that the ordinance clearly and distinctly criminalizes only solicitation for illegal activities, and does not address "constitutionally protected" activities. The city prosecutor also argued that the phrase "remains in a public place" is susceptible to a common understanding, and therefore not unconstitutionally vague. Based on the foregoing arguments, the city prosecutor maintained that the ordinance was constitutional.
Citing LSA-R.S. 14:11,[6] the trial court interpreted the word "intentional" in the ordinance to require a showing of only "general" criminal intent to prove a violation of the ordinance. After examining the effect of this intent requirement in light of the range of activities purportedly reached by the ordinance, the trial court concluded that the ordinance was unconstitutionally overbroad. In addition, the trial court, focusing upon the phrase "remains in a public place," ruled that the ordinance was unconstitutionally vague.
I now review the trial court's determination that the ordinance is unconstitutional. In so doing I begin with the trial court's finding that the ordinance is unconstitutionally vague, in violation of the defendant's right to due process under Article I, § 2 of the Louisiana Constitution of 1974 and the Fourteenth Amendment to the United States Constitution. After the vagueness claim has been addressed, I will move on to the contention that the ordinance impermissibly infringes upon rights of free speech and assembly guaranteed by Article I, §§ 7 and 9 of the Louisiana Constitution of 1974, and the First and Fourteenth Amendments to the United States Constitution.

III. The Construction of Title 13:1055 of the Baton Rouge Code of Ordinances
It is necessary, however, before I proceed further, that I place a proper construction upon the ordinance. This threshold procedure is required because the core of the defendant's unconstitutionality claims, i.e. vagueness and overbreadth, is directed at the manner in which the City of Baton Rouge has articulated its definition of criminal activity in the ordinance. In addition, as the ensuing discussion will reveal, the nature of the offense with which Ross is charged also presents certain analytical difficulties which can be alleviated by a definitive construction of the ordinance.

A. Criminal Solicitation and Free Speech and Assembly
The ordinance under which Ross is charged is peculiar in that it does not directly *1330 punish drug trafficking, but rather penalizes the defendant who "intentionally solicits, induces, entices, or procures another to engage in" illegal drug activities. Thus, Ross is charged not with engaging personally in drug trafficking, but rather with soliciting others to do so. It is the nature of the offense with which Ross is charged, criminal solicitation, which makes an analysis of the ordinance in the free speech and assembly context difficult.
Criminal solicitation falls within that family of common law offenses known as "inchoate offenses,"[7] those offenses such as attempt or conspiracy which are incipient to the completion of an actual offense. 3 Coke, Institutes of the Laws of England, P. 66 (1797); 2 Sir James Fitzjames Stephen, A History of the Criminal Law of England, Pp. 221-240 (1883). See LSA-R.S. 14:26-28.1; Sidney M. Blitzer, Jr., Comments: Conspiracy, 28 La. L.Rev. 534, 543 (1968); Commonwealth v. Anderson, 538 Pa. 574, 650 A.2d 20, 23 (1994); People v. Guerra, 40 Cal.3d 377, 220 Cal.Rptr. 374, 377-78, 708 P.2d 1252, 1256 (1985); People v. Austin, 264 Ill.App.3d 976, 202 Ill.Dec. 46, 48, 637 N.E.2d 585, 587 (1994). In other words, an inchoate offense is committed when one has advanced a certain distance towards the commission of a separate proscribed offense, although the ultimate criminal purpose is not yet (and may never be) accomplished. 21 Am.Jur.2d, Criminal Law, § 162 ("Solicitation is a substantive crime in itself, not an abortive effort to commit the crime solicited"). See also Billy J. Tauzin, Impossible Attempts, 26 La. L.Rev. 426 (1966); State v. Richards, 426 So.2d 1314 (La.1982); State v. Harper, 205 La. 228, 17 So.2d 260 (1944). "Inchoate crimes are designed to inhibit criminal conduct before it goes too far or to punish criminal conduct ... when ... it misfires." Alston v. State, 101 Md.App. 47, 643 A.2d 468, 475 (1993). See also State v. Pacheco, 125 Wash.2d 150, 882 P.2d 183, 186 (1994) (En Banc); State v. Clason, 3 Neb.App. 339, 526 N.W.2d 673, 681-82 (1994).
Inchoate offenses therefore differ from other penal laws, which typically do not implicate free speech and assembly concerns unless they directly target expressive conduct, e.g. "obscenity" ordinances. Compare Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). This is because inchoate offenses are by their nature incomplete and therefore lack a readily discernible corpus delicti; they consist solely of conduct or "overt acts" which on their face may appear innocent,[8] but which when combined with the requisite criminal intent constitute a prosecutable violation of the criminal law. See 4 Blackstone, Commentaries on the Laws of England, Pp. 78-79 (Bernard C. Gavit ed., 1941); State v. Richards, 426 So.2d 1314 (La.1982); Moffett v. State, 96 Nev. 822, 618 P.2d 1223 (1980); State v. Taft, 143 W.Va. 365, 102 S.E.2d 152 (1958); State v. Quick, 199 S.C. 256, 19 S.E.2d 101 (1942); State v. Rider, 90 Mo. 54, 1 S.W. 825 (1886). When, as in the instant case, the "overt acts" involved include constitutionally protected speech or conduct, this Court has a constitutional duty to ensure that those rights are not impermissibly infringed. See Paris Adult Theatre I v. Slaton, 413 U.S. 49, 93 *1331 S.Ct. 2628, 37 L.Ed.2d 446 (1973). "In other words, the [ordinance] must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression." Gooding v. Wilson, 405 U.S. 518, 522, 92 S.Ct. 1103, 1106, 31 L.Ed.2d 408 (1972).
The determination of whether an ordinance establishing an inchoate offense invades constitutionally protected interests must necessarily, as the trial court below realized, revolve around the element of criminal intent required by the statute. Only by requiring that the municipality prove that the overt acts of the defendant were performed "for the purpose of a criminal or unlawful object" does the ordinance clearly distinguish speech and conduct which may be properly proscribed from that which may not, i.e. distinguish "criminal solicitation" from peaceful expression. State v. Slutz, 106 La. 182, 30 So. 298, 299 (1901). An ordinance may not constitutionally prohibit Ross from hanging around on a street corner and conversing with acquaintances alone, but when such speech and conduct is linked to an intent to further a specific criminal purpose I have no trouble with concluding that the resulting combination is one which is traditionally and justifiably punishable under the criminal law.[9]See Medina v. California, ___ U.S. ___, ___, 112 S.Ct. 2572, 2577, 120 L.Ed.2d 353 (1992), citing Patterson v. New York, 432 U.S. 197, 202, 97 S.Ct. 2319, 2322, 53 L.Ed.2d 281 (1977) ("[h]istorical practice is probative" of the constitutionality of a penal law).

B. Interpretation of the Ordinance

1. Basic Principles of Interpretation
In an analysis of the ordinance, I am guided by basic precepts of statutory construction, which apply in a like manner to the construction of municipal ordinances. Landry v. Parish of East Baton Rouge, 352 So.2d 656, 661 (La.1977); Everhardt v. City of New Orleans, 217 So.2d 400, 401 (La.1968), appeal dismissed, 395 U.S. 212, 89 S.Ct. 1775, 23 L.Ed.2d 214 (1969). The primary goal in construing a statute or ordinance is to effectuate the intent of the legislative body; in so doing, I proceed under the assumption that the ordinance is valid, and note that the burden of proving any constitutional defects is upon the party alleging the ordinance's unconstitutionality. Moore v. Roemer, 567 So.2d 75, 78 (La.1990); State v. Griffin, 495 So.2d 1306, 1308 (La.1986). In construing a penal ordinance, I apply (by analogy) the rules of interpretation provided by Louisiana's Criminal Code, namely that "all of its provisions shall be given a genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision." LSA-R.S. 14:3; State v. All Pro Paint & Body Shop, Inc., No. 93-KA-1316, 639 So.2d 707, 712 (La.1994); State v. Azar, 539 So.2d 1222, 1224 (La.1988), cert. denied, 493 U.S. 823, 110 S.Ct. 82, 107 L.Ed.2d 48 (1989). I also note, however, that any doubt as to the ordinance's effective reach should be resolved in favor of the defendant. State v. Freeman, 411 So.2d 1068 (La.1982); State v. Brown, 378 So.2d 916 (La.1979).
Furthermore, I observe that "[w]henever it is possible, [Louisiana] courts have the duty to interpret statutes in a manner consistent with" our state and federal constitutions. State v. Cinel, 94-KA-0942 (La.1994), 646 *1332 So.2d 309, 313 (citations omitted). Thus, a statute which is unconstitutional on its face may be preserved by a constitutional construction, provided that the saving construction of the statute is a plausible one. See Osborne v. Ohio, 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990); City of Houston, Texas v. Hill, 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987).

2. The Penal Provision of the Ordinance
I now turn these principles toward subsection (b) of the ordinance, the subsection which describes the proscribed activity. A person violates the ordinance if that person "intentionally solicits, induces, entices, or procures another to engage in" illegal drug activities.
The City used the word "intentional," thus specifically writing an intent element into the ordinance. To violate the ordinance, one must "intend" to solicit or procure another person to engage in drug trafficking activities. Given that the ultimate goal of the ordinance, as suggested by its language and expressed orally and in brief by the city prosecutor, is to target illegal drug activity at an early stage in the distribution process, I interpret the intent requirement to extend to the illegal drug activity resulting from the solicitation or procurement. In other words, a defendant charged under this ordinance must possess the requisite intent both to solicit another and, by means of the solicitation, to secure that other's participation in illegal drug activities. Accord, Wayne R. LaFave & Austin W. Scott, Jr., Criminal Law, P. 418 (1972) ("it is necessary that the solicitor intend to achieve [the proscribed] result through the participation of another"). Finally, since solicitation by its very nature cannot occur in a vacuum, the speech and conduct utilized by a defendant to relay the criminal goal to the person being solicited are "overt acts" in furtherance of the criminal purpose; these "overt acts," when combined with the requisite criminal intent, comprise the speech and conduct effectively criminalized by the ordinance.
A question remains as to the exact level of criminal intent required by the ordinance. Louisiana criminal law recognizes two distinct levels of criminal intent: "specific" and "general" intent. LSA-R.S. 14:10. "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1); State v. Daniels, 236 La. 998, 109 So.2d 896 (1959). Thus, if the ordinance requires a "specific" criminal intent, only if Ross actually intends for his conduct to result in another person becoming involved in drug trafficking is he in violation of the ordinance. In other words, Ross must possess a subjective or actual intent to bring about the "prescribed criminal consequences," in this case the solicitation of another for criminal activity.
"General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act." LSA-R.S. 14:10(2); State v. Chism, 436 So.2d 464 (La.1983). The objective nature of general criminal intent is what distinguishes it from specific criminal intent, since "general intent exists when from the circumstances the prohibited result may reasonably be expected to flow from the offender's voluntary act, irrespective of any subjective desire on his part to have accomplished such result." State v. Elzie, 343 So.2d 712, 714 (La.1977) (emphasis added); LSA-R.S. 14:10(2). See also Ronald N. Boyce & Rollin M. Perkins, Criminal Law and Procedure, P. 497 (7th ed. 1989), citing 1 Austin, Jurisprudence, P. 424 (5th ed. 1888) ("a result is intended if it is contemplated as a probable consequence, whether it is desired or not").
Specific criminal intent, therefore, addresses itself to the actual thoughts of the defendant, while general criminal intent focuses upon the objective activity of the defendant and its probable consequences.[10] Andre' *1333 Douget, Comment, The Louisiana Criminal Code and Criminal Intent: Distinguishing Between Specific and General Intent, 46 La.L.Rev. 1061 (1986). Thus, if the ordinance requires only a general criminal intent, Ross may be convicted if, although subjectively he had no desire to solicit another for drug purposes, nonetheless the trial court decides that a reasonable person observing the defendant's objective speech and conduct would conclude that illegal drug activity would result therefrom.[11] In this case the trial court found that LSA-R.S. 14:11, see Note 6, supra, mandated that the ordinance be construed to require only a "general criminal intent," and found that such an intent requirement was insufficient to protect the defendant's constitutional rights. In reviewing this decision, it first be determined which level of criminal intent the City-Parish expected to apply; if it was a specific criminal intent, the construction of the ordinance is at an end. If it was general criminal intent, however, it will be necessary to inquire further to determine if that level of intent satisfies the demands of the free speech and assembly provisions of Louisiana and federal constitutions.

3. Construction of the Intent Requirement
Criminal solicitation, such as that punished by the ordinance, was "an offense known to the ancient common law." State v. Slutz, 106 La. 182, 30 So. 298, 299 (La.1901). See Rex v. Higgins, 102 Eng.Rep. 269, 276 (1801) ("A solicitation or inciting of another, by whatever means it is attempted, is an act done; and that such an act done with a criminal intent is punishable by indictment has been clearly established"). At the common law, criminal solicitation, like the other inchoate offenses, required a "specific intent."[12]See State v. Reagan, 111 Ill.App.3d *1334 945, 67 Ill.Dec. 506, 509, 444 N.E.2d 742, 745 (1982), aff'd, 99 Ill.2d 238, 75 Ill.Dec. 701, 457 N.E.2d 1260 (1983) ("[t]he intent requirement necessary to commit a completed offense differs from the specific intent necessary to commit [an] inchoate offense"). Accord, State v. Ray, 267 Mont. 128, 882 P.2d 1013, 1018 (1994); State v. Harmon, 104 N.J. 189, 516 A.2d 1047, 1054 (1986); Commonwealth v. Shea, 398 Mass. 264, 496 N.E.2d 631, 636 (1986); People v. Johnson, 30 Cal.3d 444, 179 Cal.Rptr. 209, 637 P.2d 676, 679 (1981); Gallegos v. People, 159 Colo. 379, 411 P.2d 956, 959 (1966) (En Banc). In the early jurisprudence of this state, when a common law designation of a crime was used in a penal statute, the applicable rule of interpretation was that "the common-law elements of the crime must be used." State v. Bellard, 23 So. 504, 506 (La.1898). Accord, State v. Berger, 156 La. 737, 101 So. 124, 125 (La.1924); Kraemer, supra, 22 So. at 255-256. See also Robert H. Marr, The Criminal Jurisprudence of Louisiana, P. 22-26 (1906) (discussing the Crimes Act of 1805 and its effect upon Louisiana criminal jurisprudence). However, even prior to the comprehensive codification of Louisiana's criminal statutes in 1942, if a statute defining a common law crime altered the common law definition of that crime, a reviewing court was bound by the parameters of the crime as expressed in the statute. State v. Cooley, 176 La. 448, 146 So. 19, 20 (1933) (arson); State v. Snowden, 174 La. 156, 140 So. 9, 9-11 (1932) (burglary); State v. Ward, 147 La. 1083, 86 So. 552, 553 (1920) (burglary).
In 1942, Louisiana's Criminal Code was substantially codified and placed into the form in which it is known today. See, generally, La.Acts.1942, No. 43, § 1; Dale E. Bennett, The Louisiana Criminal Code: A Comparison With Prior Louisiana Criminal Law, 5 La.L.Rev. 6 (1942). This Court has previously found that in the course of this codification the legislature, by means of the statutory language employed, transformed a number of crimes which were "specific intent" crimes at the common law into "general intent" crimes. See Chism, supra, 436 So.2d at 468 ("The Louisiana offense of accessory after the fact deviates somewhat from the original common law offense in that it does not require that the defendant actually know that a completed felony has occurred ... rather, it incorporates an objective standard"); State v. Raymo, 419 So.2d 858, 860 (La.1982) ("Louisiana ... has deviated from the early common law rule that forgery required an intent to defraud a particular person"). However, this Court has also recognized that in the 1942 codification the legislature retained a number of crimes "as defined at the common law." State v. Gyles, 313 So.2d 799, 800 (La.1975). Accordingly, when dealing with such offenses "[t]he historical basis of Louisiana's criminal law in the common law makes appropriate resort to common law principles for aid in interpreting legislative intent." State v. Taylor, 463 So.2d 1274, 1276 (La.1985) (citation omitted). Accord, Gyles, supra (murder); State v. Langford, 483 So.2d 979, 985 n11 (La.1986) (theft); State v. Fulghum, 242 La. 767, 138 So.2d 569, 585 (1962), appeal dismissed, 371 U.S. 5, 83 S.Ct. 82, 9 L.Ed.2d 50 (1962) (murder).
LSA-R.S. 14:11, see Note 6, supra, mandates that "in the absence of qualifying provisions" the word "intentional," which the ordinance I consider employs, connotes a "general criminal intent." However, this Court has in the past read the phrase "qualifying provisions" broadly, to include the context and purpose of the legislative enactment and, as the preceding paragraph reveals, whether the prescribed offense traces a direct and unvarying line to common law origins. See State v. Fuller, 414 So.2d 306 (La.1982); State v. Dyer, 388 So.2d 374 (La.1980); State v. Fluker, 311 So.2d 863 (La.1975). Thus, I *1335 examine the ordinance to discern whether the ultimate purpose of the ordinance requires a specific intent element, or whether the City of Baton Rouge intended to incorporate the common law definition of criminal solicitation, including its specific intent element, into the ordinance.
The ordinance is designed to deter and strike at criminal solicitation in "public places," and therefore is focused upon an objective manifestation of criminal activity. The ordinance serves a dual purpose in that it seeks not only to obviate future criminal activity, but also is clearly aimed at "sweeping the streets clean" so that security and aesthetic concerns of the general public will be assuaged. As such, it is plain that a general criminal intent requirement, i.e. an objective standard, would more completely facilitate the achievement of the ordinance's objective.
Furthermore, I note that this ordinance does not on its face or accompanying legislative commentary express any intention to incorporate elements of the common law crime of criminal solicitation. By coincidence or design, the ordinance's language substantially deviates from LSA-R.S. 14:28, the State criminal solicitation offense, which the official comments reveal is "similar to the common law crime of solicitation." LSA-R.S. 14:28, Reporter's Comment. See also Henry Morrow, The Louisiana Criminal Code of 1942Opportunities Lost and Challenges Yet Unanswered, 17 Tul.L.Rev. 1, 9 (1942). In sum, there is simply no evidence that the City of Baton Rouge intended that common law principles assist the construction of the ordinance.
As a matter of simple statutory construction, I am not free, in the absence of "qualifying provisions," to stray from the dictate of LSA-R.S. 14:11. In this case the express language and purpose of the ordinance do not compel a conclusion that anything other than general criminal intent is required to establish a violation of the ordinance. A showing of constitutional necessity is required before departing from what I consider to be a fairly simple and straightforward reading of the City-Parish Council's design in implementing the ordinance. In other words, the real question is whether anything in the state or federal constitutions requires me to read a "specific intent" requirement into this ordinance.

4. Constitutional Analysis of the Intent Requirement
Article I, §§ 7 and 9 of the Louisiana Constitution of 1974[13] read as follows:
§ 7. Freedom of Expression
Section 7. No law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom.
§ 9. Right of Assembly and Petition
Section 9. No law shall impair the right of any person to assemble peaceably or to petition government for a redress of grievances.
In interpreting Louisiana's constitutional provisions, "it is the understanding that can reasonably be ascribed to the electorate that controls." Radiofone, Inc. v. City of New Orleans, 93-WA-0962, 630 So.2d 694, 698 (La.1994) (citations omitted). Thus, "[w]hen a constitutional provision is clear and unambiguous, *1336 and its application does not lead to absurd consequences, it must be applied as written without further interpretation in search of its intent." Succession of Lauga, 624 So.2d 1156, 1165 (La.1993) (citations omitted). In addition, "[e]very provision must be interpreted in light of the purpose of the provision and the interests it furthers and resolves." Id.
The text and avowed purposes of Article I, §§ 7 and 9 of Louisiana's constitution shed no light on this issue. § 7 speaks in terms of a "freedom of speech" and an individual's "responsibility for abuse of that freedom." § 9 addresses the right of a person to "assemble peaceably." The ordinance in this particular case is, as this Court has noted, aimed at activity which is traditionally criminal in nature; Louisiana's constitutional provisions, on the other hand, speak of expansive rights which are limited by a hazy notion of individual responsibility and civility. When considering the particular questions raised herein, therefore, the express terms of Louisiana's 1974 Constitution give no guidance on where the line between the freedom of expression and the government's authority to proscribe criminal conduct should be drawn, and in this Court's jurisprudence the issue is res nova. Therefore, as this Court has at other times in the much-litigated First Amendment context, I look to federal constitutional jurisprudence to guide my consideration of corollary state constitutional provisions. See Note 13, supra.
"The application of first amendment principles to criminal defendants who incite or solicit others, or agree among themselves to commit specific, serious crimes in a non-political context has not been much explored" by the United States Supreme Court. Edward L. Barrett, Jr., William Cohen, & Jonathan D. Varat, Constitutional Law, P. 1241 (8th ed. 1989). Nevertheless, the Supreme Court has established relevant principles of constitutional law in three distinct areas of First Amendment jurisprudence, namely those cases dealing with obscenity, political agitation, and political association and assembly. I now turn to these three discrete lines of Supreme Court jurisprudence to assist in interpreting the scope of Louisiana's state constitutional provisions.
In the area of obscenity, the Supreme Court has utilized the term "scienter" to describe the requirement for knowledge of particular facts, e.g. that a certain container being shipped across state lines contains pornography, which is necessary to preserve a statute which implicates "protected" expression. See United States v. X-Citement Video, Inc., ___ U.S. ___, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994); Osborne v. Ohio, supra, at 115, 110 S.Ct. at 1699; New York v. Ferber, 458 U.S. 747, 764, 102 S.Ct. 3348, 3358, 73 L.Ed.2d 1113 (1982). The Court has consistently utilized a "background presumption of evil intent" to find that statutes aimed at regulating obscenity must require an actual knowledge of the gravamen of the offense to impose criminal culpability; an intention to engage in a (perhaps superficially innocent) course of conduct which is likely to lead to a particular societal harm, e.g. the propagation of child pornography, is simply insufficient in light of the applicable First Amendment interests. X-Citement, supra, at ___, 115 S.Ct. at 468, citing Liparota v. United States, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985); United States v. United States Gypsum Company, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). The Court has expressly noted that "the presumption in favor of a scienter requirement should apply to each of the statutory elements which criminalize otherwise innocent conduct." X-Citement, supra, at ___, 115 S.Ct. at 468. See also Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959), reh'g denied, 361 U.S. 950, 80 S.Ct. 399, 4 L.Ed.2d 383 (1960).
Although this line of jurisprudence expressly addresses itself only to "obscenity," it directly speaks to what sort of intent requirement will save a statute which, while legitimately proscribing certain "unprotected" speech or conduct, impacts significantly upon "protected" speech or conduct. These cases stand for the simple proposition that some element of subjective knowledge, i.e. "scienter," limits an obscenity statute's reach to specific "unprotected" speech or conduct.
*1337 The Supreme Court has also addressed itself to the criminalization of political speech advocating unlawful conduct, a manner of speech which, when deprived of its political character, is indistinguishable from criminal solicitation. In Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 1830, 23 L.Ed.2d 430 (1969) (per curiam) (footnote omitted), the Court declared that such speech could not be proscribed "except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."
The Brandenburg standard only permits prohibition of such speech when the speaker's exhortations are "intended to produce and likely to produce imminent disorder." Hess v. Indiana, 414 U.S. 105, 109, 94 S.Ct. 326, 329, 38 L.Ed.2d 303 (1973). This formulation thus contains an element of the familiar "specific intent,"[14] namely that the speech criminalized be spoken with "a specific intent to bring about immediate illegal results." Socialist Workers' Party v. Hardy, 480 F.Supp. 941, 946 (E.D.La.1977), aff'd 607 F.2d 704 (5th Cir.1979). See also NAACP v. Claiborne Hardware Co., 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982), re'hg denied, 459 U.S. 898, 103 S.Ct. 199, 74 L.Ed.2d 160 (1982); Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949).
Admittedly, this approach considers the "reasonable probable effect" of the speech sought to be regulated, but even if the speech leads to unlawful conduct it cannot be criminalized "unless the defendant had the specific intent to [incite such conduct] in his mind." Debs v. United States, 249 U.S. 211, 216, 39 S.Ct. 252, 254, 63 L.Ed. 566 (1919). Compare State v. Douglas, 278 So.2d 485, 487 (La.1973) (the proscribed speech must result from "a willful, intentional `endeavor' to gain as an immediate result, and specifically from that speech," the lawless conduct). Thus, like the requirement of "scienter" in the obscenity context, when dealing with inflammatory political speech the Supreme Court has found that an actual subjective intent to produce future criminal consequences is required to transform "protected" into "unprotected" and legitimately proscribable speech.
The third line of jurisprudence relevant to this inquiry deals with freedom of association, particularly political association. The United States Supreme Court has noted on a multitude of occasions that "the First Amendment `restricts the ability of the State to impose [culpability] on an individual solely because of his association with another' when the individual lacks the specific intent to further any illegal aims that may be promoted by other members of a group." Lyng v. International Union, 485 U.S. 360, 366 n5, 108 S.Ct. 1184, 1190 n5, 99 L.Ed.2d 380 (1988), quoting NAACP v. Claiborne Hardware Co., supra at 925-926, 102 S.Ct. at 3432. Accord, United States v. Grace, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983); United States v. Robel, 389 U.S. 258, 262, 88 S.Ct. 419, 422, 19 L.Ed.2d 508 (1967); Elfbrandt v. Russell, 384 U.S. 11, 15, 86 S.Ct. 1238, 1240, 16 L.Ed.2d 321 (1966); Aptheker v. Secretary of State, 378 U.S. 500, 511, 84 S.Ct. 1659, 1666, 12 L.Ed.2d 992 (1964); Schneiderman v. United States, 320 U.S. 118, 136, 63 S.Ct. 1333, 1342, 87 L.Ed. 1796 (1943). "In these cases it has been established that `guilt by association alone, without (establishing) that an individual's association poses the threat feared by the Government,' is an impermissible basis upon which to deny First Amendment rights." Healy v. James, 408 U.S. 169, 186, 92 S.Ct. 2338, 2348, 33 L.Ed.2d 266 (1972), quoting Robel, supra, at 265, 88 S.Ct. at 424.
Thus, the Supreme Court has consistently required showings of "scienter" or "specific intent," i.e. subjective or actual criminal intent, of legislation which significantly impacts *1338 upon protected expression and peaceable assembly. In addition, I note the plethora of state jurisdictions which have concluded that criminal solicitation statutes or ordinances must contain a "specific intent" requirement to survive First Amendment scrutiny.[15]See Wyche v. State, 619 So.2d 231, 236 (Fla.1993); City of Akron v. Rowland, 67 Ohio St.3d 374, 378-380, 618 N.E.2d 138, 143-144 (1993); Seattle v. Slack, 113 Wash.2d 850, 784 P.2d 494, 497 (1989) (En Banc); People v. Superior Court, 46 Cal.3d 381, 250 Cal.Rptr. 515, 519, 758 P.2d 1046, 1050 (1988) (In Bank); People v. Bright, 71 N.Y.2d 376, 526 N.Y.S.2d 66, 71, 520 N.E.2d 1355, 1359 (1988); State v. Cook, 139 Ariz. 406, 678 P.2d 987, 989 (1984); Milwaukee v. Wilson, 96 Wis.2d 11, 291 N.W.2d 452, 458 (1980); State v. Bloss, 62 Haw. 147, 613 P.2d 354, 357-358 (1980); Williams v. Osmundson, 281 N.W.2d 622, 626 (Iowa 1979); Lambert v. City of Atlanta, 242 Ga. 645, 250 S.E.2d 456, 458 (1978); State v. Armstrong, 282 Minn. 39, 162 N.W.2d 357, 361 (1968); Coleman v. City of Richmond, 5 Va.App. 459, 364 S.E.2d 239, 243 (1988), reh'g denied, 6 Va.App. 296, 368 S.E.2d 298 (1988); State v. Evans, 73 N.C.App. 214, 326 S.E.2d 303, 307 (1985); South Bend v. Bowman, 434 N.E.2d 104, 107 (Ind.App.1982); Short v. City of Birmingham, 393 So.2d 518, 522 (Ala.Cr.App.1981); In re D., 27 Or.App. 861, 557 P.2d 687, 690 (1976), review denied, 278 Or. 1 (1977), appeal dismissed, 434 U.S. 914, 98 S.Ct. 385, 54 L.Ed.2d 271 (1977).
These intent requirements serve to differentiate "protected" from "unprotected" speech, i.e. "to distinguish between conduct calculated to cause harm and conduct that is essentially innocent." Bright, supra, 526 N.Y.S.2d at 71, 520 N.E.2d at 1359. I take this jurisprudence to suggest, at a minimum, that a criminal solicitation ordinance which imperils constitutionally protected speech and assembly must contain a requirement of subjective criminal intent to survive constitutional scrutiny. Compare Ex Parte Grossman, 267 U.S. 87, 108, 45 S.Ct. 332, 333, 69 L.Ed. 527 (1925) ("[t]he language of the Constitution cannot be interpreted safely except by reference to the common law"). Therefore, I conclude, as a matter of Louisiana constitutional law, that the considerations broached above force me to construe the ordinance as requiring a specific criminal intent, as defined by Louisiana law, to solicit or procure others for illegal drug activities. I also conclude that the trial court erred in failing to give the ordinance a saving construction where such was possible. Now, armed with this construction, I proceed to a determination of the ordinance's constitutionality.

IV. The Defendant's Constitutional Claims

A. Is the Ordinance Unconstitutionally Vague?
Ross challenges the ordinance as unconstitutionally vague. Vagueness is a doctrine *1339 rooted in the due process guarantees of Article I, § 2 of the Louisiana Constitution and the Fourteenth Amendment of the United States Constitution. There are two prongs of a vagueness analysis: first, a challenged provision must give "actual notice" of what activities are criminalized sufficient to allow a reasonable person to distinguish legitimate from criminal activity; and second, that same provision should "establish minimal guidelines to govern law enforcement." Kolender v. Lawson, 461 U.S. 352, 358, 103 S.Ct. 1855, 1859, 75 L.Ed.2d 903 (1983), quoting Smith v. Goguen, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). See also State v. Barthelemy, 545 So.2d 531, 532-533 (La.1989); State v. David, 468 So.2d 1126, 1128-1129 (La.1984), cert denied, 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1985). Because of the nature of the void-for-vagueness doctrine, it is a specie of "facial" challenge; if a statute or ordinance is unconstitutionally vague, it is universally unenforceable, and therefore subject to complete invalidation. See Coates v. Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971); State v. Azar, 539 So.2d 1222 (La.1989), cert. denied, 493 U.S. 823, 110 S.Ct. 82, 107 L.Ed.2d 48 (1989).
Regarding the core penal provision of the ordinance, the prohibition against "intentional solicitation" of another for illegal drug activity, I find that the construction of the ordinance imposing an element of specific criminal intent obviates any vagueness concerns raised by Ross. Screws v. United States, 325 U.S. 91, 101, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945) (plurality opinion) ("The Court, indeed, has recognized that the requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid"). Subsection (b) of the ordinance lucidly sets forth the extent of the proscribed activities; furthermore, Subsection (d) of the ordinances makes it clear that "merely remain[ing] in a public place without also intentionally soliciting ... or procuring another to engage" in illegal drug activities does not violate the ordinance. "[W]here the punishment imposed is only for an act knowingly done with the purpose of doing that which the [ordinance] prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law." Screws, supra, at 102, 65 S.Ct. at 1036.
Counsel for Ross raised in oral argument the fact that the term "loitering" has been found by a number of courts to be inherently vague. While I do not concede counsel's proposition, even if I assume that the term "loiter" is inherently vague it does not affect my opinion on this issue. The term "loitering" as used in the ordinance is merely classificatory, providing a nomenclature by which the ordinance may be referred to and discussed in an abbreviated manner. The ordinance could have been called "Ordinance X," which is surely inherently vague; this would not mean that the body of the ordinance fails to give sufficient notice of what activity is criminal or fails to establish minimum guidelines for law enforcement officers.
The trial court expressly found the phrase "remains in a public place," in subsection (b), the penal provision of the ordinance, to be unconstitutionally vague. "Public place" is generally defined in subsection (a)(5) of the ordinance as "an area generally visible to public view." This Court has previously been called upon to interpret statutes that proscribe conduct which occurs in a "public place," and on those occasions this Court has not found the phrase's supposed "vagueness" to be an obstacle to its application. See State v. Muller, 365 So.2d 464, 466-467 (La.1978) (on rehearing); State v. Christine, 239 La. 259, 118 So.2d 403, 405-406 (1960), citing Nelson v. Natchez, 197 Miss. 26, 19 So.2d 747 (1944). I note that police officers in particular have an understanding of the distinction between "public" and "private" places, since the constitutional propriety of much of their conduct depends upon this distinction. See, e.g., California v. Greenwood, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988); United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). See also Note 18, infra. For these reasons, I find that the term "public place" as defined in the ordinance is not unconstitutionally vague.
The trial court appeared to focus upon the ambiguous temporal aspect of the verb "remains" *1340 in reaching its conclusion that the ordinance was unconstitutionally vague. I disagree with the trial court's emphasis upon the amount of time one must "be" in a public place to "remain" there, and the resulting conclusion, for three reasons. "First, the court notes that whether the statutory language of [an] ... ordinance prohibits `remaining' or `being' on the streets is insignificant because `remain' and `to be' are generally given synonymous interpretations at the enforcement level for the obvious reason they have as a practical matter ... no intelligible difference in meaning, and a judicial determination on this ground as to the validity of an ordinance is mere semantics and untenable." Bykofsky v. Borough of Middletown, 401 F.Supp. 1242, 1252 (M.D.Pa.1975), aff'd, 535 F.2d 1245 (3d Cir.1976), cert. denied, 429 U.S. 964, 97 S.Ct. 394, 50 L.Ed.2d 333 (1976). Second, "Webster's Third New International Dictionary (Unabridged Ed.1961) reveals that the root meaning of `remain' is `to stay,' and makes no reference to a time requirement." Hernandez v. State, 783 S.W.2d 764, 765 (Tx.App.1990). Third, no other court which has examined the question has found the term "remains" or any of its derivatives to be unconstitutionally vague. See State in the Interest of J.A.V., 558 So.2d 214, 216 (La.1990); Williams v. Osmundson, supra, at 627; Hernandez, supra, 783 S.W.2d at 765; State v. Belcher, 161 Ariz. 133, 776 P.2d 811, 812 (1989), denial of habeas corpus aff'd, Belcher v. Crist, 953 F.2d 1386 (9th Cir.1992); Bykofsky, supra, 401 F.Supp. at 1252; Hurley v. Hinckley, 304 F.Supp. 704, 711 (D.Mass.1969), aff'd, 396 U.S. 277, 90 S.Ct. 603, 24 L.Ed.2d 469 (1970). In sum, I find that the term "remains" is a concept so ingrained in the vernacular that "men of common intelligence [need not] guess at its meaning and differ as to its application." Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).
Thus, regarding the first prong of the void-for-vagueness test, while "there are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, [this ordinance is] set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with." United States Civil Service Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548, 578-579, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973). As far as the second prong, i.e. that the ordinance establish sufficient guidelines to limit the discretion of law enforcement personnel, I find that "[a]ny discretion possessed by police to determine whether a crime has occurred is merely a question of probable cause to arrest and not a flaw in the definition of the crime itself." Superior Court, supra, 758 P.2d at 1057. For these reasons I think that the trial court erred in finding the ordinance unconstitutionally vague.

B. Does the Ordinance Violate the Free Speech and Assembly Provisions of the State and Federal Constitutions?[16]
In this case the City of Baton Rouge has charged Ross with remaining in a public *1341 place and "intentionally" soliciting another to engage in illegal drug activities. In the course of his overbreadth challenge Ross argues that the ordinance is unconstitutional insofar as it penalizes a number of constitutionally protected activities.
"As a general rule, the First Amendment [of the federal Constitution and Article I, §§ 7 and 9 of the Louisiana Constitution of 1974] provide that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." DeSalvo v. State, 624 So.2d 897, 899 (La. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1067, 127 L.Ed.2d 386 (1994), citing Police Dep't of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). However, "there are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any constitutional problem." Cinel, supra, at 312, quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 571-572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). Overbreadth analysis exists because, in cases where the point of demarcation between regulation of "protected" and "unprotected" speech is hazy, the risk that arbitrary, vindictive, or selective enforcement of the provision may have a "chilling effect" upon rights of speech and assembly warrants an exception to the general rule that courts review legislative acts only "as applied" to the parties before them.[17] Lawrence Tribe, American Constitutional Law, Pp. 1022-1023 (2d ed. 1988). See also Secretary of State of Maryland v. Joseph H. Munson Co., Inc., 467 U.S. 947, 965, 104 S.Ct. 2839, 2851-2852, 81 L.Ed.2d 786 (1984) (overbreadth appropriate where there is "no core of easily identifiable and constitutionally proscribable conduct that the statute prohibits").
There are two salient aspects to an overbreadth challenge. The first is that it is a "facial" challenge; a reviewing court does not examine the challenged statute or ordinance "as applied" to the parties before it, but rather "tests the constitutionality of the legislation in terms of its potential applications." *1342 Geoffrey R. Stone et alia, Constitutional Law, P. 1039-1040 (1986). Thus, overbreadth allows "attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite specificity." Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965). See also NAACP v. Button, 371 U.S. 415, 432, 83 S.Ct. 328, 338-339, 9 L.Ed.2d 405 (1963); Note, The First Amendment Overbreadth Doctrine, 83 Har.L.Rev. 844 (1970). The second, and far more significant, aspect of the overbreadth doctrine is that, if applicable, the offensive legislation is voided "on its face," i.e. in its entirety, regardless of whether constitutional applications of the legislation exist. See Board of Airport Comm'ners v. Jews for Jesus, 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987); City of Houston, Texas, supra.
As has already been noted, the jurisprudence reveals a bifurcation between speech which is protected from governmental regulation and speech which may legitimately be limited or even prohibited, i.e. "unprotected" speech. Ross argues that the ordinance is unconstitutional "because criminal liability for drug loitering is indistinguishable from and in fact defined in terms of constitutionally protected conduct." City of Tacoma, supra, 827 P.2d at 1381. The defendant's argument dissipates in the light of a proper construction of the ordinance.
"[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge;" rather, the potentially impermissible applications of a challenged statute or ordinance must be "substantial" when compared to the activities which it may properly proscribe. Los Angeles City Council v. Taxpayers for Vincent, 466 U.S. 789, 800, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984). See also Broadrick, supra, at 615-616, 93 S.Ct. at 2917. When the ordinance is viewed in light of the construction placed upon it, I find that any overbreadth is insubstantial. "By requiring specific intent and overt acts, the ordinance does not then reach into the arena of constitutionally protected First Amendment conduct." City of Tacoma, supra, 827 P.2d at 1384. The ordinance as construed simply does not reach constitutionally protected activity. Id, at 1380.
The ordinance prohibits any speech or conduct which the speaker engages in with the specific intent to induce others to engage in illegal drug activities. This category of speech is clearly "unprotected." See Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502, 69 S.Ct. 684, 691, 93 L.Ed. 834 (1950) ("[i]t has never been deemed an abridgement of freedom of speech ... to make a course of conduct illegal merely because it was conduct in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed"). Criminal speech and conduct such as this may be prohibited "even though intertwined with expression and association." Cox v. Louisiana, 379 U.S. 559, 563, 85 S.Ct. 476, 480, 13 L.Ed.2d 487 (1965).
While I clearly endorse the propriety of the ordinance's purpose, I nonetheless recognize that since the ordinance addresses itself to the communicative impact of public speech and assembly there is bound to be some incidental impact upon "protected" speech and assembly. The test for determining the constitutionality of such a regulation is that set out in United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968), reh'g denied, 393 U.S. 900, 89 S.Ct. 63, 21 L.Ed.2d 188 (1969):[18]

*1343 we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest....
In this case, the ordinance's goal is the eradication of drug trafficking from the public places of Baton Rouge, and I find that interdicting drug distribution networks through the criminalization of public solicitation of illegal drug activities is a historically accepted and reasonable exercise of the City-Parish's delegated police power. In particular, I find the words of the New York Supreme Court of Appeals, written in 1969, persuasive on this point:
It appears that the Legislature in enacting the statute before us sought to prevent generally idle and dissolute persons engaged in the unlawful traffic of narcotics, from drawing together for that purpose in places frequented by other citizens, thereby endangering public health, morals, and tranquility. This protection of innocent citizens from drug users is a very crucial problem. As has recently been pointed out by several newspaper articles, in some of our poorer urban areas where drug use is high, innocent citizens are often beaten, robbed, and even murdered by drug addicts. It is completely reasonable and proper for the Legislature to protect these citizens from accidentally stumbling into the midst of such miscreants in the common areas....
People v. Pagnotta, 25 N.Y.2d 333, 305 N.Y.S.2d 484, 489, 253 N.E.2d 202, 206 (1969) (citations omitted). See also Bykofsky, supra, 401 F.Supp. at 1258 ("[t]he Borough has a legitimate interest in the reasonable control of its streets"). These sentiments are at least as valid now as they were in 1969.
Based upon the foregoing, I conclude that the City of Baton Rouge has a substantial, if not compelling, interest in combatting drug trafficking, and that the ordinance is a constitutionally proper way for it to attack this problem. With the underlying purpose of the ordinance in mind, I find that the City's design does not include the deliberate suppression of any "protected" expression. Finally, I find that the ordinance, which penalizes only those who engage in speech or conduct specifically designed to procure others for illegal drug activity, is "narrowly tailored to prohibit only" the targeted unlawful conduct, and that therefore any collateral and/or marginal impact upon legitimate expression is no greater than required to achieve the ordinance's intended goal. City of Houston, supra, at 465, 107 S.Ct. at 2511. For these reasons, I adjudge that the ordinance "as applied" to Shelton Ross is not in violation of Article I, §§ 7 and 9 of the Louisiana Constitution of 1974, or the First Amendment of the United States Constitution.
It must be noted that when an ordinance such as this is challenged on overbreadth grounds, the proper procedure is to evaluate the constitutionality of the legislation based upon its effective reach as construed, i.e. to look at the speech or conduct actually penalized. The police may arrest a murderer while he is standing on a soap box in a public forum making a political speech to a peacefully assembled political organization; however, it simply does not follow from this that the statute forbidding murder in any way infringes upon freedoms of speech and assembly. The gist of the defendant's arguments in this case are directed not at the scope of the ordinance and its impact upon "free expression," the proper subject of overbreadth analysis, but rather to questions of probable cause and evidentiary sufficiency which implicate constitutional provisions unrelated to Article I, §§ 7 and 9 of the Louisiana Constitution of 1974 and the First Amendment of the United States Constitution.
I recognize that the nature of criminal solicitation in particular and inchoate offenses in general is such that there may be *1344 more opportunity for abuse in the enforcement of such an ordinance.[19] However, "the fact that a law may be improperly applied or even abused does not render it constitutionally invalid." City of Milwaukee, supra, 291 N.W.2d at 458. Rather, any contention that constitutional privacy or due process guarantees have been violated "can be adequately dealt with in the course of prosecution of individual cases on their individual facts; these concerns are not an adequate predicate for finding that the [ordinance] is invalid on its face."[20]Superior Court, supra, 758 P.2d at 1054.
Ross also alleged that subsection (c)[21] of the ordinance impermissibly criminalizes a number of innocent activities. However, the express language of that subsection reveals that the enumerated activities are not in themselves proscribed, but are merely "[a]mong the circumstances which may be considered in determining whether [a] person intends" to solicit others for illegal drug activities. This subsection is not a penal provision; instead, by its own language it merely creates guidelines to assist municipal law enforcement personnel in their inquiries.[22] The focus of overbreadth is the extent to which *1345 the challenged statute or ordinance proscribes constitutionally protected expression; since subsection (c) merely clarifies the penal provision of subsection (b) but does not itself forbid protected speech or conduct, I find subsection (c) irrelevant to the defendant's overbreadth challenge.
I conclude that the ordinance is not unconstitutionally overbroad since it does not impermissibly impinge upon rights of "free expression" guaranteed by the Louisiana and federal constitutions. In my opinion, the trial court erred when it determined otherwise.

V. Conclusion
Based upon the preceding analysis, I conclude that the trial court erred in finding Title 13:1055 of the Baton Rouge Code of Ordinances to be unconstitutionally vague and overbroad. Once construed to contain a requirement of specific criminal intent, the ordinance sufficiently distinguishes between "protected" and "unprotected" constitutional speech and conduct to preclude the overbroad regulation of "protected" activities. In addition, the specific intent requirement, insofar as it clarifies which speech and conduct is regulated by the ordinance, renders the defendant's claims of vagueness insubstantial.
I reiterate in closing my view that the Louisiana Constitution of 1974 requires that, in a criminal case, issues of mandatory appellate jurisdiction should be decided prior to any consideration of nonconstitutional issues entertained under this Court's supervisory jurisdiction. Accordingly, I present this special concurrence to the opinion of the Court, of which I am also the author.
For these reasons, I respectfully concur.
NOTES
[*] Justice Jeffrey P. Victory, Associate Justice, not on panel. Rule IV, Part 2, § 3. See State v. Barras, 615 So.2d 285, 286 n. 1 (1993).
[1] § 143. Preemption of state law

No governing authority of a political subdivision shall enact an ordinance defining as an offense conduct that is defined and punishable as a felony under state law.
[2] This ordinance, originally numbered Ordinance 9572, Section 1, was adopted by the Metropolitan Council of the Parish of East Baton Rouge and the City of Baton Rouge on January 27, 1993, and codified at Title 13:1055 of the Code of Ordinances of the City of Baton Rouge (as amended). See La. Const. Art. VI, § 10. This ordinance was lawfully adopted, pursuant to specific constitutional authorization:

The right of the City of Baton Rouge to enact ordinances which prohibit certain criminal conduct and to have those violations prosecuted in city court stems from the Home Rule Charter enacted under the authority of Article XIV, Section 3(a), of the Louisiana Constitution of 1921. The Louisiana Constitution of 1974 continued in effect existing Home Rule Charters and the powers, functions and duties empowered by those charters. La. Const. Art. VI, Section 4.
Bush ex rel. State v. Williams, 504 So.2d 1060 (La.App. 1 Cir.1987), writ denied, 505 So.2d 1131 (La.1982). See also 1921 La. Const. Art. XIV, Section 40(d) ("every municipality shall have ... the ... right to adopt and enforce local police... regulations"); State v. Reuther, 227 La. 1037, 81 So.2d 387, 389 (1955).
[3] Focusing upon the facts before him, the trial court found that "the same evidence is warranted for a conviction under this statute that's warranted for a conviction under" corresponding state felony statutes, and that therefore double jeopardy would attach for purposes of a subsequent state felony prosecution. The trial court then discussed how subsection (b) of the ordinance on its face required proof of a violation of LSA-R.S. 40:966-971.1, and in addition how the "solicits, induces, entices, or procures" language of the ordinance implicates the state statutes defining the "principal" theory of criminal culpability and the inchoate offenses of "conspiracy" and "attempt." See LSA-R.S. 14:24, 26, 27.
[4] LSA-C.Cr.P. Art. 595(1) provides that "[a] person shall not be considered as having been in jeopardy in a trial in which ... the court was illegally constituted or lacked jurisdiction." This statutory declaration accords with the traditional limitation upon double jeopardy protection that "before a person can be said to have been put in jeopardy of life or limb the court in which he was acquitted or convicted must have had jurisdiction to try him for the offense charged." Grafton v. United States, 206 U.S. 333, 345, 27 S.Ct. 749, 751, 51 L.Ed. 1084 (1907); United States v. Ball, 163 U.S. 662, 669, 16 S.Ct. 1192, 1194, 41 L.Ed. 300 (1896). Thus, "conviction of a minor offense in an inferior court does not bar a prosecution for a higher crime, embracing the former, where the inferior court did not have jurisdiction of the higher crime." State v. Birckhead, 256 N.C. 494, 124 S.E.2d 838, 842 (1962).

In Suire the State also alleged that double jeopardy had not attached because "[t]he indictment was invalid." Suire, supra, 319 So.2d at 349; LSA-C.Cr.P. Art. 595(3). However, LSA-C.Cr.P. Art. 595(3) only addresses defects in the form or content of the affidavit, information, or indictment which initiates a prosecution, not any infirmity in the underlying statute or ordinance upon which the prosecution is based. See State v. Garcia, 588 So.2d 703 (La.1991) (per curiam); State v. Ruple, 437 So.2d 873 (La.App. 2 Cir. 1983). In addition, the jurisprudence makes it clear that this provision may not be invoked by the State to annul a prior conviction; rather, the invalidity of the affidavit, information, or indictment must be raised "on the motion of the defendant himself" for this exception to double jeopardy to apply. State v. Williams, 301 So.2d 587, 588 (La.1974). See also Ball, supra, at 669-670, 16 S.Ct. at 1195; State v. Mann, 250 La. 1086, 202 So.2d 259 (1967); State v. Owens, 28 La. Ann. 5 (La.1876).
[5] This provision provides that "[n]o local governmental subdivision shall ... define and provide for the punishment of a felony."
[6] In doing so, the Foy Court noted that "[a]s in Suire, 319 So.2d 349 n2, there is no evidence of a collusive effort to avoid State prosecution." Foy, supra, 401 So.2d at 950 n1.
[7] Article VI, § 9(A)(1) of the Louisiana Constitution of 1974 does not affect the adjudicatory jurisdiction of local courts; this provision limits only "local governmental subdivisions," defined in Article VI, § 44(1) as a parish or municipality. Local courts, on the other hand, are entities distinct from such "local governmental subdivisions," separate creatures of the legislature whose composition and jurisdiction are defined exclusively by legislative act. See La. Const. Art. V, § 15(A); La. Const. Art. XIV, § 16(A)(5) (retaining prior courts and continuing legislative supremacy over municipal courts, posited in 1921 La. Const. Art. VII, § 51, in statutory form). See also 12, infra.
[8] This view is bolstered by the fact that House Bill No. 275, which eventually became LSA-R.S. 14:143, was presented to the responsible House committee by Raymond Lamonica, executive counsel to the Governor, and to the responsible Senate committee by Pete Adams, a representative of the Louisiana District Attorney's Association. See Committee Meeting Minutes, House Comm. on Admin. of Criminal Justice, House Bill No. 275, Pp. 4-5 (April 21, 1983); Committee Meeting Minutes, Senate Comm. on Judiciary (B), House Bill No. 275, Pp. 2-3 (June 14, 1983).
[9] City of New Orleans also posited a second prong of this test, namely that "the litigant must show that the state statute and the ordinance are incompatible and cannot be effectuated in harmony." City of New Orleans, supra, 640 So.2d at 252. In this case, since the state statute's aim is to void the local ordinance, we consider this showing made.
[10] The "police power" is "[t]he power vested in the legislature to make, ordain, and establish all manner of wholesome and reasonable laws, statutes, and ordinances ... not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same." Black's Law Dictionary, P. 1317 (4th ed. 1968) (citation omitted) (emphasis added). In the American constitutional scheme, the "police power" is the legislative authority enjoyed by the states, i.e. not constitutionally delegated to the federal government or constitutionally appropriated by the federal Congress, as the residuary sovereigns in our federal system. See Brown v. Maryland, 25 U.S. (12 Wheat) 419, 6 L.Ed. 678 (1827); Munn v. Illinois, 94 U.S. (4 Otto) 113, 24 L.Ed. 77 (1859). In Louisiana, "the constitution presupposes the existence of the police power and is to be construed with reference to that fact." Borden v. Louisiana State Board of Education, 168 La. 1005, 123 So. 655, 661 (1929). This corresponds to the "general principle of judicial interpretation that, unlike the federal constitution, a state constitution's provisions are not grants of power but instead are limitations on the otherwise plenary power of the people of a state exercised through its legislature." Director of La. Recovery Dist. v. Taxpayers, 529 So.2d 384, 387 (La.1988) (emphasis added). Accord, La. Const. Art. III, § 1(A); New Orleans, etc. v. Civil Service, etc., 422 So.2d 402, 406 (La.1982).
[11] Prosecutions for the violation of municipal ordinances proceed, as a practical matter, in the local city or parish court. The statutes defining the jurisdiction of city courts make it clear that all prosecutions must be tried without a jury, and therefore a city court cannot constitutionally sentence a defendant to a term of imprisonment for more than six months without hard labor. See LSA-R.S. 13:1895; State v. Bosworth, 373 So.2d 152, 154 (La.1979); State v. Hebert, 543 So.2d 637 (La.App. 1 Cir.1989). Parish courts are explicitly limited to the imposition of a penalty not to exceed six months imprisonment without hard labor. See LSA-R.S. 13:1450; State v. Boasso, 478 So.2d 945 (La.App. 5 Cir.1985), writ denied, 484 So.2d 660 (La.1986); State v. Davis, 427 So.2d 1238, 1240 (La.App. 2 Cir.1983). The effect of these provisions is to guarantee that a defendant who is convicted or pleads guilty to a municipal offense in a municipal or parish court is limited to a maximum sentence of six months imprisonment without hard labor.
[12] By its plain language LSA-R.S. 14:143 does not affect the adjudicatory jurisdiction of local, i.e. municipal, parish, or mayoral, courts. See City of Baton Rouge v. Malik, 404 So.2d 883, 885 (La.1981) (on original hearing). LSA-R.S. 13:1894, which defines the general criminal jurisdiction of municipal courts, grants such courts jurisdiction over "the trial of offenses committed within their respective territorial jurisdictions which are not punishable by imprisonment at hard labor, including the trial of cases involving the violation of any city or parochial ordinance." Accord, LSA-R.S. 13:1446(A); 2493(A); 2501.1(F); LSA-R.S. 33:441 (same or similar language used to prescribe jurisdiction of mayor's courts, parish courts and New Orleans city and traffic courts). This statute provides that for a municipal court to entertain jurisdiction, a proceeding must "involve" a "trial" for a "violation" of any "city or parochial ordinance;" it says nothing about whether that ordinance must be valid, or even constitutional for that matter. Compare City of Harahan v. Olson, 200 So.2d 874, 875 (La.1967). Although we do not here contest the power of the legislature to shape the jurisdiction of local courts, we believe that a statute expressly directed towards the governing authority of a Louisiana political subdivisions does not do so. Contrast Bosworth, supra, 373 So.2d at 154 ("R.S. 13:1895 specifically provides that prosecutions in city courts are to be tried without a jury"). See also Note 7, supra.

Furthermore, construing the statute in such a way as to deprive local courts of jurisdiction over local criminal matters would not effectuate the Legislature's purpose in passing LSA-R.S. 14:143, since the district court would still enjoy its constitutionally assigned "original jurisdiction of all ... criminal matters." La. Const. Art. V, § 16(A)(1). See Hebert, supra, 543 So.2d at 638 (municipal prosecution transferred to district court); Boasso, supra, 478 So.2d at 949 (same). Finally, such a reading the statute might lead to circumstances where "the court was without jurisdiction in the first instance, even though sentence was imposed or served." People v. Anderson, 140 A.D.2d 528, 528 N.Y.S.2d 614, 615 (N.Y.App.1988) (citation omitted). Such a result, subjecting that defendant to a second punishment for substantially the same offense without a clear legislative intent to do so, would implicate the "multiple punishment" prong of double jeopardy. See Missouri v. Hunter, 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983); Whalen v. United States, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980); State ex rel. Restrepo v. State, 593 So.2d 1258, 1259 (La.1992).
[13] A continuous offense is "a continuous, unlawful act or series of acts set in motion by a single impulse and operated by unintermittent force." State v. Barlow's, Inc., 111 Idaho 958, 729 P.2d 433, 436 (1986), citing United States v. Midstate Horticultural Co., Pa., 306 U.S. 161, 59 S.Ct. 412, 83 L.Ed. 563 (1939); State v. Williams, 211 Neb. 650, 319 N.W.2d 748 (1982); State v. Johnson, 212 N.C. 566, 194 S.E. 319 (1937). Official Revision Comment (d) to LSA-C.Cr.P. Art. 596 states that "Clause (2) of the above Art. 596 is necessary to prevent multiple prosecutions for continuous offenses." Thus, a "continuous offense," which involves a single criminal "impulse" that may produce criminal consequences over a long period of time, e.g. possession of stolen goods over several months, must be distinguished from the situation where a number of offenses are committed in the course of a single transaction, e.g. aggravated battery during a kidnapping. For the former, only prosecution for the single offense, regardless of its duration, is permitted; for the latter, this provision is inapposite and does not itself bar a prosecution for each distinct "offense" perpetrated in the single transaction (although other double jeopardy limitations may apply).
[14] Although we speak here in terms of LSA-C.Cr.P. Art. 596, as a practical matter issues of double jeopardy have been resolved with recourse to the relevant constitutional provisions since the Fifth Amendment's double jeopardy clause was made enforceable against the states by incorporation into the Fourteenth Amendment. See Benton v. Maryland, 395 U.S. 784, 794, 89 S.Ct. 2056, 2062, 23 L.Ed.2d 707 (1969). With this in mind, we have in the past and continue to interpret our state statutory and constitutional double jeopardy provisions in light of the purposes behind the United States Constitution's prohibition against "double jeopardy:"

(1) To prevent undue harassment of accused criminals with anxieties and the expense of repeated prosecution and the expense of repeated prosecution for the same offense;
(2) To eliminate the likelihood that innocent persons, accused of a crime, may be convicted solely because of repeated prosecution;
(3) To achieve certainty, reliability, and respect for the judicial process;
(4) To assure the finality of judgments and give to final judicial determinations the full force and effect of res judicata;
(5) To avoid the imposition of multiple and increased punishment for a single offense, thereby circumventing subsequent legislative enactments regarding the punishment imposed for specific crimes.
Bray v. State, 506 S.W.2d 772, 774-775 (Tenn. 1974).
[15] In addition, we have also stated that under this test even where the same evidence is not needed to secure a conviction for both prosecutions, double jeopardy will nonetheless bar a second prosecution where "the gravamen of the second offense is essentially included within the offense for which first tried." State v. Nichols, 337 So.2d 1074, 1076 (La.1976) (citations omitted). We have employed this ancillary prong to the "same evidence" test primarily to associate a number of criminal acts which occur in the course of a single transaction or occurrence and which, although established by different facts, nonetheless comprise the same discrete "wrong" or "injury" which the law seeks to punish and deter. See State ex rel Smith v. Phelps, 345 So.2d 446, 450 (La.1977); Nichols, supra, 337 So.2d at 1078; City of Baton Rouge v. Jackson, 310 So.2d 596, 599-600 (La.1975); State ex rel Wikberg v. Henderson, 292 So.2d 505, 507-509 (La.1974).
[16] In State v. Carouthers, 607 So.2d 1018, 1028 (La.App. 3 Cir.1992), vacated on other grounds, 618 So.2d 880 (La.1993), the court of appeal found that where nine rocks of cocaine seized in the defendant's room were used to prove possession of cocaine with intent to distribute, and two other rocks sold to an undercover officer were used to prove distribution of cocaine, no double jeopardy attached because the "same evidence" was not used to secure each conviction. Carouthers may be contrasted with State v. Leblanc, 618 So.2d 949, 957 (La.App. 1 Cir.1993), where the court found that the use of the same package of cocaine to prove possession of cocaine and attempted distribution of cocaine arising out of the same transaction constituted double jeopardy under the "same evidence" test. See also State v. Twohig, 624 So.2d 16, 17 (La.App. 4 Cir.1993).
[17] We have on occasion found that it was unnecessary for a defendant to go through the rigors of a second trial when the prosecution's prospective offer of proof at a second trial was sufficiently specified in the indictment or information, or by a bill of particulars or other discovery device. See, e.g., Nichols, supra, 337 So.2d at 1076. In City of Baton Rouge v. Jackson, supra, 310 So.2d at 600, however, we reversed the trial court's decision quashing a DWI prosecution on double jeopardy grounds and remanded the case for trial, observing that it was conceivable that the State might rely upon evidence other than that utilized in the first prosecution to obtain a conviction in the second. The only cases where we have employed the "same evidence" test prior to the initial trial of a defendant have involved the particular situation presented by a duplicitous indictment or misjoinder of defendants or offenses. See LSA-C.Cr.P. Art. 495, 532(3); State v. Coody, 448 So.2d 100, 103-104 (La.1984).
[18] In United States v. Deshaw, 974 F.2d 667, 670 (5th Cir.1992), the federal Fifth Circuit noted that even if the statutory elements of two offenses were not identical there were still three other ways, as a matter of federal constitutional law, that the two statutes could qualify as the "same offense." The first, the "same conduct" test, no longer exists. See United States v. Dixon, supra, at ___, 113 S.Ct. at 2860 (overruling Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990)). The second, the collateral estoppel component of the double jeopardy clause enunciated in Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), is of no assistance to us in formulating a preemption standard for LSA-R.S. 14:143 because it requires an initial trial resulting in the acquittal of the defendant and a correlation of facts at issue in the first and second trials before it comes into play. See State v. Bolden, 639 So.2d 721 (La. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 724, 130 L.Ed.2d 629 (1995).

The third, however, is applicable to our situation; it is that doctrine treating lesser-included offenses and the greater offense in which they are included as the "same offense." See Harris v. Oklahoma, 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977); Brown v. Ohio, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). Properly understood, this approach does not deviate from the Blockburger analysis, since that test provides that two offenses are not the "same" for double jeopardy purposes only if each requires proof of a fact the other does not. In a situation where one offense is subsumed into the other, there is no fact which must be proven to secure a conviction as to the lesser-included offense which must not also be proven to convict for the greater offense, and thus under Blockburger the two offenses are the "same."
Although this principle is fairly straightforward, courts have struggled with situations where there are a variety of lesser-included offenses which might serve as components of the greater offense. See Illinois v. Vitale, 447 U.S. 410, 419-421, 100 S.Ct. 2260, 2267, 65 L.Ed.2d 228 (1980); United States v. Colon-Osorio, 10 F.3d 41, 45-46 (1st Cir.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994); Rubino v. Lynaugh, 845 F.2d 1266, 1269-1270 (5th Cir.1988). The best example of this is felony-murder, where a variety of felonies may constitute the lesser-included offense in felony-murder. Since our purpose here is not to clarify the scope of the double jeopardy doctrine in Louisiana, but only to formulate a standard by which the preemptive reach of LSA-R.S. 14:143 may be gauged, we need not directly address this dilemma; the fact that double jeopardy might present itself in the context of a conviction under a municipal ordinance and a subsequent prosecution under a state felony statute, with one or the other of these provisions being under some circumstances a lesser-included offense of the other, is sufficient to invoke the preemptive power of LSA-R.S. 14:143.
[19] In such application, a trial court should also apply any of the extant "exceptions" to the Blockburger rule. See, e.g., United States v. Felix, 503 U.S. 378, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992) (conspiracy and substantive crime not the "same offense"); State v. Poland, 255 La. 746, 232 So.2d 499 (1970) (attempted murder and murder not "same offense" where victim dies after attempted murder conviction secured).
[20] Since the ordinance was passed in 1993, see Note 2, supra, and the statute enacted in 1983, we need not address whether LSA-R.S. 14:143 may be applied retroactively to ordinances passed prior to its effective date.
[21] Even were we to interpret LSA-R.S. 14:28 as a general intent crime it would not change our analysis. Although the fact that the definition of specific intent is subsumed into that of general intent, see LSA-R.S. 14:10(2), confuses the issue, nevertheless whenever an offense requires proof of a criminal intent, general criminal intent is the baseline. It is a showing of actual or subjective criminal intent, not just objective circumstances, which would constitute a relevant "other fact" in Blockburger terms. Were LSA-R.S. 14:28 a general intent crime, it would merely mean that the ordinance required proof of two additional facts, that the violation occurred in public and with specific intent, that LSA-R.S. 14:28 does not. LSA-R.S. 14:28 would still not require proof of any facts that the ordinance did not (because specific intent is included in the definition of general intent), and thus would still constitute the "same offense" under Blockburger.
[22] On March 18, 1994, the trial court issued a supplement to its earlier judgment in which it stated that "the court also reviewed LSA-R.S. 15:1351 et seq., and found that the conduct regulated by City Ordinance 13:1055, is also preempted by certain provisions of this state statute." Given our finding that the ordinance is expressly preempted by LSA-R.S. 14:143 we need not directly address this supplemental judgment. However, we do note that courts have consistently found that racketeering and other "criminal enterprise" statutes do not proscribe the "same offense" as their predicate acts. See United States v. O'Connor, 953 F.2d 338 (7th Cir.1992), cert. denied, 504 U.S. 924, 112 S.Ct. 1979, 118 L.Ed.2d 578 (1992); United States v. Evans, 951 F.2d 729 (6th Cir.1991), cert. denied, 504 U.S. 920, 112 S.Ct. 1966, 118 L.Ed.2d 567 (1992); United States v. Arnoldt, 947 F.2d 1120 (4th Cir. 1991), cert. denied, 503 U.S. 983, 112 S.Ct. 1666, 118 L.Ed.2d 387 (1992); United States v. Erwin, 793 F.2d 656 (5th Cir.1986), cert. denied, 479 U.S. 991, 107 S.Ct. 589, 93 L.Ed.2d 590 (1986). In addition, the drug racketeering statute does not so "occupy the field" of narcotics regulation that "the exercise of dual authority is repugnant to a legislative objective." Palermo Land Co. v. Planning Comm'n, 561 So.2d 482, 497 (La.1992), citing Hildebrand v. City of New Orleans, 549 So.2d 1218, 1227 (La.1989).
[23] Even were the effect of LSA-R.S. 14:143 to deprive the local court of subject matter jurisdiction the "lack of standing" hurdle would remain. This is because a final disposition by a court without subject matter jurisdiction is, for double jeopardy purposes, "merely voidable, not void ab initio." Commonwealth v. Johnson, 435 Pa.Super. 132, 645 A.2d 234, 244 (1994), citing McCarver v. State, 379 So.2d 979 (Fla.1980); In re Bryan, 16 Cal.3d 782, 129 Cal.Rptr. 293, 548 P.2d 693 (1976); Walls v. State, 326 So.2d 322 (Miss.1976).
[24] This case is consistent with our opinion in Connick insofar as both decisions affirm and defend the constitutional prerogative of the district attorney to investigate and prosecute those who violate state criminal statutes. In Connick, we held that the district attorney's constitutional right to pursue a criminal investigation and prosecution under state criminal statutes can only be enjoined by a district court in exceptional circumstances. In this case we conclude that the Legislature, to bolster the constitutional authority of the district attorney, has determined that district attorneys should be free of the specter of a felony defendant invoking double jeopardy based upon a prior municipal conviction under a municipal ordinance which penalizes the same conduct as the state felony statute. The appropriate remedy for alleviating such municipal "interference" in state criminal prosecutions, also expressly conferred by LSA-R.S. 14:143, is the preemption of such ordinances, and the appropriate procedural vehicle for the district attorney to invoke this remedy is the declaratory judgment action provided for in our Code of Civil Procedure.
[25] The proper parties to this action are of course the State, through its representative the district attorney, and the affected local governmental subdivision, which must be made a party to the proceeding. LSA-C.C.P. Art. 1880.
[1] This Court has long enjoyed appellate jurisdiction over such cases because of the need that legislative bodies have for a rapid and conclusive determination of the constitutional limitations upon their discretion to prescribe laws. See City of New Orleans v. Ehrlich, 256 La. 226, 235 So.2d 577 (1970); State v. Edwards, 207 La. 506, 21 So.2d 624 (1945); City of New Orleans v. Postek, 180 La. 1048, 158 So. 553 (1935); State v. Hagen, 136 La. 868, 67 So. 935 (1915); City of Crowley v. Brande, 128 La. 457, 54 So. 940 (1911). To promote a rapid and final resolution of such questions, the appellate jurisdiction enjoyed by this Court over such questions has traditionally been exclusive. See State v. Jones, 128 La. 1097, 55 So. 687 (1911); Sherman v. Cabildo Const. Co., 483 So.2d 1210 (La.App. 4 Cir.1986); City of Port Allen v. Louisiana Mun. Risk Management Agency, 423 So.2d 107 (La.App. 1 Cir. 1982); Spinato v. City of New Orleans, 113 So.2d 71 (La.App. 4 Cir.1971).
[2] Paragraph (C) of Article V, entitled "Scope of Review," specifies that this Court shall review both law and facts in civil cases, and shall review only legal questions in criminal cases. The "scope of review" addressed in this subsection of the judiciary article should not be confused with the "extent of review" discussed in subsection (F); these two distinct concepts are addressed in separate subsections of the 1974 Constitution, and in separate paragraphs of the 1921 Constitution.
[3] This Court has also, however, limited the application of Article V, § 5(F)'s "supplemental" appellate jurisdiction to those issues "which have been ruled on by the trial court," rejecting the contention that "all issues raised in the plaintiff's petition" are included in this jurisdictional grant. Church Point Wholesale Beverage v. Tarver, 614 So.2d 697, 700-701 (La.1993).
[4] "Expression of one thing is the exclusion of another." Black's Law Dictionary, P. 692 (Rev. 4th ed., 1968).
[5] In this case, the defendant has a right to appellate and/or supervisory review in the court of appeal of the nonconstitutional issues encompassed by the trial court's judgment. See La. Const. Art. V, § 10(A); LSA-C.Cr.P. Art. 912(B).
[6] LSA-R.S. 14:11 provides in pertinent part that "in the absence of qualifying provisions, the terms `intent' and `intentional' have reference to `general criminal intent.'"
[7] "[A]t common law one who counsels, incites or solicits another to commit a felony, is indictable as a principal or an accessory before the fact." State v. Blechman, 135 N.J.L. 99, 50 A.2d 152, 154 (1946) (citation omitted). Although Louisiana has statutorily altered some aspects of common law culpability for principals, it has not strayed from the basic principle that one who solicits another to commit an offense may be prosecuted as a principal to that crime. LSA-R.S. 14:23; State v. McAllister, 366 So.2d 1340 (La.1978). See also State v. Johns, 209 La. 244, 24 So.2d 462, 463 (1946) ("all persons concerned in the commission of a crime, whether they directly commit the act constituting the crime ... or counsel or procure another to commit the crime, are principals"). Thus, insofar as prospective defendants may be prosecuted for either being a principal to a completed or "choate" offense or for the inchoate offense of soliciting the commission of that offense, the discussion herein applies to any prosecution under a principal theory which implicates relevant constitutional freedoms. See State v. Kotwitz, 549 So.2d 351, 361 (La.App. 2 Cir.1989), writ denied, 558 So.2d 1123 (La.1990) ("[s]hould the person solicited actually commit the crime, the inciter would be guilty as a principal (LSA-R.S. 14:24)").
[8] The overt act, however, "must be in part execution of the intent to commit the goal crime." State v. Green, 116 N.M. 273, 861 P.2d 954, 961 (1993) (quotation omitted). See also State v. Reyes, 862 S.W.2d 377, 383 (Mo.App.1993).
[9] In State v. Robertson, 293 Or. 402, 649 P.2d 569 (1982) (In Banc), the Oregon Supreme Court was faced with the constitutionality of a "criminal coercion" statute which allegedly infringed upon free speech rights. In the course of analyzing this claim in the context of Article I, Section 8 of the Oregon Constitution, which deals with freedom of expression, the court had this to say:

Article I, Section 8 ... forecloses the enactment of any law written in terms directed to the substance of any "opinion" or any "subject" of communication, unless the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees ... demonstrably were not intended to reach. Examples are perjury, solicitation or verbal assistance in crime, some forms of theft, forgery and fraud and their contemporary variants. See Greenawalt, Speech and Crime, 1980 Am. B.Found.Res.J. 645, 648-670. Only if a law passes that test is it open to a narrowing construction to avoid "overbreadth" or to scrutiny of its application to particular facts.
Robertson, supra, 649 P.2d at 576 (emphasis added).
[10] Although Louisiana's statutory distinction between specific and general criminal intent is of fairly recent vintage, it imports a distinction which is ages old. See 2 Stephen, supra, at 111 ("a man must be held to intend the natural consequences of his act"). This distinction is one which is universally, if intuitively, appreciated; as Oliver Wendell Holmes put it, "even a dog distinguishes between being stumbled over and being kicked." Oliver Wendell Holmes, The Common Law, P. 3 (1881).
[11] The distinction between specific and general criminal intent is particularly telling when applied in the context of an inchoate offense. Since such an offense is by its nature incomplete, and typically is only prosecuted in the absence of a completed offense, the determination of intent must often be a speculative one given that the ultimate criminal purpose has not come to fruition. An objective test under such circumstances runs the risk of inflicting a criminal penalty upon a person who is in every sense of the word "innocent" in that they not only possess no actual desire to inflict harm upon another person or general society, but additionally have in fact caused no such harm. I do not dispute the power of the legislature to proscribe certain conduct due to the likelihood that such conduct will in the ordinary course of events tend to produce harmful results. See Holmes, supra, at 53-56. However, while I base my discussion in this special concurrence solely upon jurisprudential considerations, I cannot help but recognize that there is at least a degree of injustice in the scenario discussed in the preceding sentences of this footnote. Compare 4 Blackstone, supra, at 5-6.
[12] The concept of "specific intent" at the common law had a much more circumscribed application than our current statutory definition of "specific intent." See LSA-R.S. 14:10(1); State v. Kraemer, 22 So. 254, 256 (La.1897) (comparing common law concepts of "malice" and "specific intent"). A brief explanation of the parameters of the common law definition of the term is in order, since when companion state and federal jurisdictions refer to "specific intent," they typically ascribe to it the meaning it possessed at the common law. See United States v. Bailey, 444 U.S. 394, 403, 100 S.Ct. 624, 631, 62 L.Ed.2d 575 (1980).

The reason the common law created the class of "specific intent" crimes was that with such offenses "the [specific] intent raises a strong probability that an act, innocent in itself, will be followed by other acts or events in connection with which it will accomplish the result sought to be prevented by the law." Holmes, supra, at 76. See also Boyce & Perkins, supra, at 498 (at the common law "specific intent" crimes demanded "a specified intention in addition to an intended act"); State v. Edgar, 124 Ariz. 472, 605 P.2d 450 (1979) (In Banc); State v. May, 93 Idaho 343, 461 P.2d 126 (1969). Thus, "specific intent" as understood at the common law was a subjective state of mind, an active desire by the offender to achieve some prospective criminal goal. See Boyce & Perkins, supra, at 497, quoting 1 Markby, Elements of Law, Section 220 (4th ed. 1889) ("the doer of an act may advert to a consequence and not desire it: and therefore not intend it").
Two examples of such "specific intent" crimes are larceny and burglary. See State v. Meche, 7 So. 573, 575 (La.1890) ("Bishop, in his treatise on Criminal Law, ... elaborates the rule ... requiring proof of two intents in both larceny and burglary"). Depriving another of property was only larceny when it was combined with an intent to deprive that person of the property permanently; otherwise, it was merely punishable as a civil wrong. Holmes, supra, at 70-74. Similarly, a trespass into a dwelling, also punishable as a civil wrong, was transformed into a felony when the trespasser possessed the specific intent to commit another felony within the dwelling. Id, at 74-75. In both cases, the overt acts performed by the offenders only invited criminal culpability when combined with a "specific intent" to engage in a future course of criminal conduct. Although the current Louisiana definition of "specific intent" appears to be broader than the common law formulation in that it embraces an active desire to achieve any criminal consequences, either in the present or at some future time, the rationale underlying both the common law and Louisiana approaches revolves around subjective criminal intent, that is an actual intention by the offender that his activity lead to a criminal result.
[13] "[T]he appropriate procedure in deciding a case such as this is to analyze state law, including the constitutional provisions, before reaching a federal constitutional claim." State v. Schirmer, 93-KA-2631 (La.1994), 646 So.2d 890 (Dennis, J., concurring), citing State v. Hattaway, 621 So.2d 796 (La.1993); State v. Perry, 610 So.2d 746 (La.1992). This approach is a sensible one, since the failure of this Court to clarify whether we determine a case upon state or federal constitutional or statutory grounds carries with it important consequences for any subsequent review of that case in an appropriate federal forum. See Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). Although this Court draws freely upon relevant federal constitutional jurisprudence to inform the application of our state constitution, and in fact has consistently interpreted the protections offered by Article I, §§ 7 and 9 of our constitution as coextensive with those of the First Amendment of the United States Constitution, nevertheless this Court must always consider whether our state constitution offers greater or different protections in any given circumstance. See Cinel, supra; State v. Burgess, 543 So.2d 1332 (La.1989); State v. Newton, 328 So.2d 110 (La.1975).
[14] There is a reason for this familiarity. The Brandenburg test for the constitutionality of the content-based regulation of political advocacy supplanted the "clear and present danger" test of Justice Oliver Wendell Holmes. This "clear and present danger" test, although focused upon a "dangerous progress towards the consummation of the crime," i.e. an "overt act," was nevertheless founded in the general criminal law of attempt (an inchoate offense), and therefore required a "specific intent" as that term was understood at the common law. Chafee, Free Speech in the United States, 47 (1941). See Abrams v. United States, 250 U.S. 616, 40 S.Ct. 17, 63 L.Ed. 1173 (1919); Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919).
[15] A number of these cases assert that although a specific intent element may save a statute or ordinance from First Amendment scrutiny, that requirement is effectively negated if that statute or ordinance also provides that "specific intent" will be conclusively presumed if the prosecution can show the defendant's participation in certain specified activities. See Wyche, supra; City of Akron, supra. Compare Note 22, infra. This observation is relevant insofar as it relates to the distinction between "specific" and "general" intent in Louisiana law. There is in actuality not much difference between our "general intent," which relies upon objective conduct and its ordinary consequences, and a provision that finds "specific intent" exists in the presence of certain speech or conduct. Although these standards theoretically differ in that the defendant's subjective knowledge is inconsequential to the former while it is the professed object of the latter's inquiry, they are functionally identical in that both focus the attention of the trier-of-fact solely upon objective speech and conduct. Stated another way, in both a "general intent" or "conclusive presumption" context, once the prosecution has made a sufficient showing of objective facts, evidence concerning the defendant's actual intent is irrelevant and not competent to rebut the prosecution's evidence. This is in essence a problem of proof; is the prosecution's burden limited to a showing of objective facts alone, or are those facts merely circumstantial evidence which may give rise to an inference that specific intent exists, but which the defense may strive to rebut through adversarial evidence and argument? These state courts, like the United States Supreme Court, have concluded that in the sensitive arena of "free expression," the criminality of one's speech and/or conduct should not depend upon the manner in which a legislative body views it. Rather, a defendant in such instances possesses a right to argue to the trier-of-fact that another interpretation, an "innocent" one, of his or her expression exists, and that the right is one of constitutional dimension.
[16] Although expressed in terms of the ordinance's overbroad reach, much of the activity which Ross claims is constitutionally protected, e.g. lingering about in a public place and conversing with acquaintances, involves speech and conduct which he was engaged in at the time of his arrest. See Wyche, supra, 619 So.2d at 235 ("[h]ailing a cab or a friend, chatting on a public street, or simply strolling aimlessly are ... clearly protected under Florida as well as federal law"); City of Tacoma v. Luvene, 118 Wash.2d 826, 827 P.2d 1374, 1382 n5 (1992) (En Banc) (quotation omitted) ("the right to walk, stroll, or wander aimless is a liberty within the sensitive First Amendment"); State v. Walker, 369 So.2d 1345, 1346 (La.1979) (State cannot penalize "[t]he mere presence of someone in the area where the controlled dangerous substance is found, or mere association with the person found to be in possession of the contraband"). In Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 504, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1985), the United States Supreme Court explained that whereas overbreadth analysis may be necessary to protect vital speech and assembly interests when the parties before the Court are engaged in "unprotected" speech or conduct,

[i]t is otherwise where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish.... There is then no want of a proper party to challenge the statute, no concern that an attack on the statute will by unduly delayed or protected speech discouraged. The statute may forthwith be declared invalid to the extent that it reaches too far, but otherwise left intact.
Thus, only when a reviewing court can find "no apparent saving construction" of challenged legislation may an "as applied" analysis be bypassed, since case-by-case adjudication of universally unenforceable legislation serves no useful purpose. Board of Airport Comm'ners, supra, at 575, 107 S.Ct. at 2572. See also City of Houston, supra, at 468, 107 S.Ct. at 2513. For these reasons, therefore, I believe that the trial court proceeded incorrectly in engaging in overbreadth analysis without a preliminary determination that the ordinance was constitutional "as applied" to Ross. Since the purpose of this special concurrence is not to address the procedural approach of the trial court but rather to reach the merits of his declaration of unconstitutionality, I note this only in passing.
[17] Because overbreadth is such "strong medicine" the contexts in which it may be utilized are narrowly circumscribed. Broadrick v. Oklahoma, 413 U.S. 601, 613, 615, 93 S.Ct. 2908, 2916, 2917-2918, 37 L.Ed.2d 830 (1973). See also Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 636-638, 100 S.Ct. 826, 835-837, 63 L.Ed.2d 73 (1980), reh'g denied, 445 U.S. 972, 100 S.Ct. 1668, 64 L.Ed.2d 250 (1980). Overbreadth analysis may be applied to a statute or ordinance which expressly regulates "spoken words." Gooding v. Wilson, 405 U.S. 518, 520, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972). See also Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). Overbreadth attacks have also been allowed upon statutes or ordinances which seek to regulate or prohibit membership in political organizations on the grounds that such regulation is violative of the right to peaceably assemble. See Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Scales v. United States, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). In addition, an overbreadth analysis may be appropriate when reviewing certain regulations in the free speech arena which threaten to "chill" speech rights through the mechanism of "prior restraint." See FW/PBS, Inc., d/b/a Paris Adult Bookstore II v. City of Dallas, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); Fort Wayne Books, Inc. v. Indiana, 489 U.S. 46, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989); City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988); Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). Aside from these notable exceptions, however, parties alleging infringement of other types of constitutionally protected activity, even though those activities may involve types of "protected" speech, e.g. commercial speech, are limited to challenging the offending provision "as applied." See Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). In this case, since the challenged ordinance on its face regulates both public speech, the content of that speech, and, to a lesser extent, public assembly, it certainly qualifies for overbreadth analysis.
[18] The ordinance, as applied in this case, ostensibly regulates speech and assembly in a variety of traditional public fora. See Schirmer, supra, 646 So.2d at 901, quoting Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) ("Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public"). Even speech which is not regulated on the basis of content (which Ross's speech certainly is) can only be regulated in a public forum if the regulation is narrowly drawn to further a significant state interest. See Heffron v. Int'l Society for Krishna Consciousness, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966); Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). However, since I consider the standards set forth in O'Brien to be at least as stringent as those applicable to regulation of public speech, my conclusion regarding the ordinance's validity under the O'Brien test applies to the "public forum" facet of the ordinance as well.
[19] However, the United States Supreme Court has stated that "`innocent behavior will frequently provide the basis for a showing of probable cause,' and that `[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts.'" United States v. Sokolow, 490 U.S. 1, 10, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989), quoting Illinois v. Gates, 462 U.S. 213, 243-244 n13, 103 S.Ct. 2317, 2334-2335 n13, 76 L.Ed.2d 527 (1983).
[20] Underscoring this point, I reiterate that overbreadth is a particularized mode of analysis which is confined to questions of free speech and assembly. If a criminal defendant wishes to argue that other constitutional provisions have been violated in the case before the bar, sufficient procedures exist to remedy such violations. Overbreadth is not a "back door" through which a criminal defendant may test the application of a statute or ordinance in every conceivable situation against the full panoply of protections the Louisiana and federal constitutions offer. The nature of our democratic society, which relies in large measure upon a free exchange of ideas and opinions for its vitality, demands an exception to the general rule that "facial" challenges to legislation are disfavored, i.e. overbreadth. These unique circumstances do not exist in other constitutional contexts, and therefore overbreadth analysis should only apply to claims of unconstitutionality under Article I, §§ 7 and 9 of the Louisiana Constitution, and the First Amendment of the federal constitution.
[21] Section 13:1055. Drug-Traffic Loitering.

* * * * * *
(c) Among the circumstances which may be considered in determining whether the person intends such prohibited conduct are that he or she:
(1) Is seen by the officer to be in possession of drug paraphernalia; or
(2) Is a known drug trafficker; or
(3) Repeatedly beckons to, stops or attempts to stop passersby, or engages passersby in conversation; or
(4) Repeatedly stops or attempts to stop motor vehicle operators by hailing, waiving of arms or any other bodily gesture; or
(5) Circles an area in a motor vehicle and repeatedly beckons to, contacts, or attempts to stop pedestrians; or
(6) Is the subject of any court order, which directs the person to stay out of any specified area as a condition of release from custody, a condition of probation or parole or other supervision or any court order, in a criminal or civil case involving illegal drug activity; or
(7) Has been evicted as the result of his or her illegal drug activity and ordered to stay out of a specified area affected by drug-related activity.
[22] Insofar as these guidelines appear to be applicable to the trial court as trier-of-fact, I also note that this subsection does not create an unconstitutional mandatory presumption. Such presumptions, which either require a trier-of-fact to find a fact if a predicate fact is established (mandatory conclusive presumption), or which shift the burden of persuasion to the defendant to rebut the inference created by the predicate fact (mandatory rebuttable presumption), violate the due process requirement that the prosecution have the burden of proving every element of a crime beyond a reasonable doubt. See Carella v. California, 491 U.S. 263, 265, 109 S.Ct. 2419, 2420, 105 L.Ed.2d 218 (1989); Francis v. Franklin, 471 U.S. 307, 313, 105 S.Ct. 1965, 1972-1973, 85 L.Ed.2d 344 (1985); State v. Searle, 339 So.2d 1194 (La.1976) (on rehearing). However, subsection (c) of the ordinance does not mandate that a trier-of-fact must find the requisite intent if one of the enumerated activities is demonstrated at trial; rather, the subsection merely posits an inference, a constitutional "permissive" presumption, which the trier-of-fact is free to reject. Compare State v. Lindsey, 491 So.2d 371, 374 (La.1986), citing County Court of Ulster County v. Allen, 442 U.S. 140, 157-158, 99 S.Ct. 2213, 2224-2226, 60 L.Ed.2d 777 (1979). This interpretation, which flows from a natural understanding of the ordinance's language, is bolstered by the fact that the ordinance is "open-ended," i.e. the enumerated activities are only "among" those which a trier-of-fact may consider. Contrast Northern Virginia Chapter, ACLU v. City of Alexandria, 747 F.Supp. 324, 328 (E.D.Va.1990).